James David MILLS and Brenda Mills, Individually and as Next Friend of Lauren Michelle Mills and Jessica Danielle Mills, Minor Children, Appellants,

v.

Jorge ANGEL, M.D., Buford Wells, M.D., Bayshore Medical Center, Inc. and Pasadena Bayshore Hospital, Inc., Appellees.

No. 06–96–00086–CV.

Court of Appeals of Texas, Texarkana.

Submitted Nov. 2, 1998.

Decided June 10, 1999.

Denice Smith, Smith & Nobles, Houston, Jim M. Perdue, Jr., Mark D. Clore, Perdue & Clore, Houston, for appellants.

Robert J. Swift, Fulbright & Jaworski, Houston, John C. Marshall, Marshall & Gonzales, Houston, Richard A. Sheehy, Lauren Beck, McFall, Sherwood, Sheehy, Houston, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

David and Brenda Mills and their daughters, Lauren and Jessica Mills, appeal an instructed verdict granted in favor of Bayshore Medical Center, Inc. and Pasadena Bayshore Hospital, Inc.[1] (Hospital), in their direct corporate liability suit against the Hospital.

The key issue before us on appeal is the appropriate standard of care a hospital owes its patients in its administrative role of overseeing the practice of physicians who have staff privileges to practice in the hospital.

The Millses contend the trial court erred in granting a directed verdict in favor of the Hospital on their direct corporate liability. They argue (1) expert medical testimony concerning the doctors' negligence was sufficient to support their bases of direct corporate liability against the Hospital, (2) expert administrative or ministerial testimony is not always required when a hospital is sued for negligence under direct corporate liability, and (3) if expert administrative testimony was required to support their direct corporate liability claims against the Hospital, it was not required in the instant case because the Hospital's negligence was within the common knowledge of laymen.

David and Brenda Mills and their two children filed suit against Dr. Jorge Angel, Dr. Buford Wells,[2] and the Hospital for injuries David Mills suffered during a cervical laminectomy in June 1993. The Millses sued the Hospital on two theories: (1) vicarious liability for the alleged negligence of the nursing staff during the surgery, and (2) direct corporate liability for the alleged negligence of the Hospital. The trial court granted a directed verdict against the Millses and in favor of the Hospital on the Millses' direct corporate liability claims. Trial was to a jury, and the jury found there was no negligence by the nursing staff of the Hospital that proximately caused injury to David Mills. The Millses do not appeal this finding. The Millses appeal the directed verdict granted in favor of the Hospital on their direct corporate liability claims.

David Mills worked as a profusionist at the Hospital, running a heart and lung machine during surgical procedures. On January 6, 1992, David went to Dr. Jorge

---

1. Bayshore Medical Center, Inc. d/b/a Pasadena Bayshore Hospital, Inc. is a single entity.

2. The jury found Dr. Angel's and Dr. Wells's negligence proximately caused David's injuries. The jury determined Dr. Angel was forty percent responsible for David's injuries and Dr. Wells was sixty percent responsible for David's injuries. The trial court entered judgment against the doctors pursuant to a high/low settlement agreement.

Angel, a surgeon with staff privileges at the Hospital, complaining of pain in his left shoulder and weakness in his left hand. David had a herniated disk near the sixth vertebra at the base of his neck. Dr. Angel recommended David undergo a surgical procedure called a cervical laminectomy. During a cervical laminectomy, the surgeon shaves off part of the bone in the neck to relieve pressure on the spinal cord. David asked Dr. Angel to perform the surgery and asked Dr. Buford Wells, who also had staff privileges at the Hospital, to be his anesthesiologist.

In January 1992, Dr. Angel and Dr. Wells performed the surgery. The surgery was successful and relieved David's symptoms. In May 1993, the symptoms returned, and David again consulted Dr. Angel. Dr. Angel recommended another cervical laminectomy, believing David had possibly regenerated some disk material. David sought a second opinion from another neurosurgeon, who also recommended a laminectomy. Again, David asked Dr. Wells to administer the anesthetic and Dr. Angel to perform the surgery.

David's second surgery took place in June 1993. The surgery was performed while David was in a sitting position with his head slightly flexed. Dr. Angel chose a horseshoe headrest and adhesive tape to stabilize David's head. Both Dr. Angel and Dr. Wells positioned David's head in the headrest. David awoke from surgery without any feeling in his arms or legs. The surgical nurse notified Dr. Angel and Dr. Wells that David could not move his arms or legs. Dr. Angel performed another surgery that evening, but found nothing to explain David's paralysis. David apparently suffered from a reduction in blood flow to his spinal cord, death of the cells in his spinal cord. David is now a quadriplegic. Neither doctor has ever had this type of surgery result in paralysis.

The Millses sued the Hospital on five bases of direct corporate liability: (1) policies and procedures—in failing to formulate or enforce policies and procedures to ensure adequate peer review and quality assurance of its medical staff; (2) equipment—in providing antiquated surgical and anesthesia equipment; (3) continuing medical education—in failing to require its medical staff to attend continuing medical education; (4) peer review—in failing to conduct regular peer review to detect surgical and anesthesia problems in the operating room; and (5) credentialing—in negligently credentialing or recredentialing the defendant doctors and in extending surgical and anesthesia privileges, in failing to limit the privileges of the defendant doctors when they did not demonstrate competence, and in failing to require that modern surgical and anesthesia equipment be used in its operating rooms.

A directed verdict under Rule 268 of the Texas Rules of Civil Procedure [3] is proper only under limited circumstances, e.g., where (1) a specifically indicated defect in the opponent's pleading makes it insufficient to support a judgment; or (2) the evidence proves conclusively the truth of fact propositions which, under the substantive law, establish the right of the movant or negate the right of his opponent to judgment; or (3) the evidence is insufficient to raise an issue of fact as to one or more fact propositions which must be established for the opponent to be entitled to judgment.[4] The trial court may properly withdraw a case from the jury and instruct a verdict if there is no evidence to support a material issue.[5]

---

3. Tex.R. Civ. P. 268.

4. *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90–91 (Tex.App.-Corpus Christi 1992, writ dism'd w.o.j.); *Texas Employers Ins. Ass'n v. Duree*, 798 S.W.2d 406, 408 (Tex. App.-Fort Worth 1990, writ denied); *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 932 (Tex.App.-San Antonio 1989, writ denied); *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 932–33 (Tex.Civ.App.-Corpus Christi 1981, writ ref'd n.r.e.).

5. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex.1986); *Kelly*, 832 S.W.2d at 91.

When reviewing a directed verdict, this Court views the evidence in the light most favorable to the party against whom the verdict was rendered and disregards all contrary evidence and inferences.[6] If the Court finds that there is any evidence of probative value which raises a material fact issue, the judgment must be reversed and the case remanded for the jury's determination of that issue.[7]

The Millses argue the trial court erred in directing a verdict in favor of the Hospital because the law does not require expert testimony on a hospital's negligence under their bases of direct corporate liability. Specifically, the Millses contend expert testimony on the Hospital's negligence was not necessary when the jury had already heard expert testimony that Dr. Wells and Dr. Angel were negligent. In essence, the Millses are arguing that the showing of negligence on the part of the doctors is enough under the facts of the present case to also hold the Hospital liable for David's injuries. The Hospital contends that the Millses failed to offer any evidence, expert or otherwise, on the Hospital's standard of care, or that the standard was breached so as to proximately cause David's injuries.

The Millses also assert the jury could have determined whether the Hospital was negligent because their bases of direct corporate liability involved only nonmedical, administrative, and/or routine hospital care that were within the jury's common knowledge. We agree that the facts and circumstances of the particular case will dictate whether expert testimony is necessary or whether the alleged negligence is within the jury's common knowledge. Before answering whether the facts of this case required expert testimony, we will first examine the law that explains when expert testimony is required.

To prevail on a medical negligence cause of action, the plaintiff must prove (1) a duty by the physician/nurse/hospital to act according to applicable standards of care;[8] (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury.[9] Under Texas law, a hospital may be liable independently of the negligence of its physicians or employees. Hospital liability under this direct theory of liability arises from the negligent performance of a duty the hospital owes *directly* to the patient.[10] Among these direct duties are (1) a duty to provide its patients with appropriate and usable medical equipment;[11] (2) a duty to keep its premises in a reasonably safe condition;[12] (3) a duty not to negligently

6. *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303 (Tex.1988); *Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 830 (Tex.App.-Texarkana 1996, writ denied).

7. *Qantel Bus. Sys., Inc.*, 761 S.W.2d at 304; *Southland Lloyd's Ins. Co.*, 919 S.W.2d at 830.

8. *Hall v. Huff*, 957 S.W.2d 90, 101 (Tex.App.-Texarkana 1997, writ denied). In *Hall*, this Court stated that in a medical malpractice action, the appellant has the burden to establish by expert testimony (1) the standard of care, and (2) facts showing that the physician or hospital deviated from that standard. *Id.* at 101.

9. *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, writ dism'd by agr.).

10. *LaCroix*, 947 S.W.2d at 950. *See generally* 2 RICHARD L. GRIFFITH & DEWEY W. JOHNSTON, TEXAS HOSPITAL LAW § 3.03, at 63.1–71 (2d ed.1995); Terry O. Tottenham, *Current Hospital Liability in Texas*, 28 S. TEX. L. REV. 1, 10–19 (1987); Jim M. Perdue, *Direct Corporate Liability of Hospitals: A Modern Day Legal Concept of Liability for Injury Occurring in the Modern Day Hospital*, 24 S. TEX. L.J. 773, 774 (1983).

11. *LaCroix*, 947 S.W.2d at 950. *See, e.g., Bellaire Gen. Hosp., Inc. v. Campbell*, 510 S.W.2d 94, 98 (Tex.Civ.App.-Houston [14th Dist.] 1974, writ ref'd n.r.e.); *cf. Hernandez v. Smith*, 552 F.2d 142, 144 (5th Cir.1977) (duty to provide adequate facilities).

12. *LaCroix*, 947 S.W.2d at 950 (citing *Charrin v. Methodist Hosp.*, 432 S.W.2d 572, 574–75 (Tex.Civ.App.-Houston [1st Dist.] 1968, no writ)).

allow termination of medical care;[13] (4) a duty to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel;[14] and (5) a duty to exercise reasonable care in the selection of its medical staff and to periodically monitor and review the medical staff's competence.[15]

The test for determining whether a hospital has a duty of care and whether that duty has been breached is what an ordinary hospital would have done under the same or similar circumstances.[16] The medical standard of care is the threshold issue that a plaintiff must establish before the fact finder determines if the defendant deviated from the standard of care to a degree that constitutes negligence.[17] As a general rule, expert testimony is required to establish the governing standard of care and to determine whether the standard has been breached.[18] Expert testimony is generally required when the underlying issue involves the performance of medical procedures[19] because the nature of the alleged negligence is not within the com-

mon knowledge of laymen.[20] But when the underlying negligence involves the standard of nonmedical, administrative, ministerial, or routine care at a hospital, expert testimony is not needed because the jury is competent from its own experience to determine and apply such a reasonable care standard.[21] The alleged negligence of the Hospital in the instant case involves the standard of care for a hospital in its credentialing processes, in its supervision of its doctors, and in the doctors' performance of medical procedures. The Millses were required to present expert testimony on the general standard of care for a hospital on these matters because the alleged negligence of the Hospital, under the present facts, was not within the common knowledge of laymen.

In determining the standard of care, we look to not only what an ordinary hospital would do under the circumstances, but we may also look to the hospital's internal policies and bylaws.[22] However, hospital rules alone do not reflect the standard of care.[23]

13. *LaCroix*, 947 S.W.2d at 950; *Brownsville Med. Ctr. v. Gracia*, 704 S.W.2d 68, 77 (Tex. App.-Corpus Christi 1985, writ ref'd n.r.e.); *Valdez v. Lyman–Roberts Hosp., Inc.*, 638 S.W.2d 111, 116 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.).

14. *LaCroix*, 947 S.W.2d at 950; *see also Air Shields, Inc. v. Spears*, 590 S.W.2d 574, 576–81 (Tex.Civ.App.-Waco 1979, writ ref'd n.r.e.).

15. *LaCroix*, 947 S.W.2d at 950; *Park N. Gen. Hosp. v. Hickman*, 703 S.W.2d 262, 265–66 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.), *disapproved by St. Luke's Episcopal v. Agbor*, 952 S.W.2d 503, 509 (Tex.1997).

16. *LaCroix*, 947 S.W.2d at 950; *Hilzendager v. Methodist Hosp.*, 596 S.W.2d 284, 286 (Tex. Civ.App.-Houston [1st Dist.] 1980, no writ); *see also* 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.011, at 49.

17. *LaCroix*, 947 S.W.2d at 950; *Johnson v. Berg*, 848 S.W.2d 345, 348 (Tex.App.-Amarillo 1993, no writ); *Coan v. Winters*, 646 S.W.2d 655, 657 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.); 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.011, at 49.

18. *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex.1977); *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Huff*, 957 S.W.2d at 101; *LaCroix*, 947 S.W.2d at 950.

19. *LaCroix*, 947 S.W.2d at 950–51; *St. Paul Med. Ctr. v. Cecil*, 842 S.W.2d 808, 814 (Tex. App.-Dallas 1992, no writ).

20. *LaCroix*, 947 S.W.2d at 950–51; *Cecil*, 842 S.W.2d at 813. *See, e.g., Downing v. Gully*, 915 S.W.2d 181, 185 (Tex.App.-Fort Worth 1996, writ denied). *See generally* 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.012, at 49–52.

21. *Cecil*, 842 S.W.2d at 812 (citing *Golden Villa Nursing Home, Inc. v. Smith*, 674 S.W.2d 343, 349 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) [quoting *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis.2d 147, 172 N.W.2d 427, 428 (1969)]).

22. *LaCroix*, 947 S.W.2d at 951.

23. *See LaCroix*, 947 S.W.2d at 951; *Hicks v. Canessa*, 825 S.W.2d 542, 544 (Tex.App.-El Paso 1992, no writ); *Hilzendager*, 596 S.W.2d at 286; *see also Darling v. Charleston Commu-*

In *Denton Regional Medical Center v. LaCroix,*[24] the Fort Worth Court of Appeals held that the standards set by the Joint Commission on Accreditation of Health Care Organizations (JCAHO) could also be looked at in determining the appropriate standard of care for a hospital.[25] However, according to the legal treatise cited by the Fort Worth Court of Appeals, the standards were formulated as *ultimate goals* and not as universal minimal standards.[26] We will not examine the JCAHO standards as evidence of the standard of care for a hospital in the instant case because they were not admitted into evidence, no witness testified as to the standards, and they are not universal minimal standards. Michael White, director of resource in case management for the Hospital, testified the Hospital was accredited by the JCAHO, but this testimony did not establish the JCAHO standards for evidentiary purposes.

First, we will address the Millses' claim that the Hospital was negligent in failing to formulate or enforce policies and procedures to ensure adequate peer review and quality assurance of its medical staff. A hospital has a duty to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel.[27] Further, some courts have recognized a duty to use due care in enforcing such policies and procedures and in ensuring that they are not violated.[28] The essence of the

Millses' argument is two-fold: (1) the Hospital was negligent in failing to have a policy that prevented Dr. Angel from doing a sitting laminectomy with adhesive tape instead of skull pins, tongs, or clamps; and (2) the Hospital was negligent in failing to have a policy that prevented Dr. Wells from monitoring David's blood pressure with a blood pressure cuff instead of an arterial line, central venous line, or Doppler device.

To present any evidence of probative force raising a fact issue on the Hospital's negligence in failing to formulate or enforce its policies and procedures, the Millses had to present evidence on the general standard of care for a hospital. A hospital's standard of care in formulating and enforcing its policies is determined by expert testimony and a hospital's bylaws and policies.[29]

The evidence presented by the Millses on the standard of care for a hospital in formulating and enforcing policies and procedures and on the standard of care for a hospital in conducting peer review and credentialing overlaps. Therefore, we will consider the following as evidence of the standard of care for a hospital in addressing the Millses' contentions that the Hospital failed in its duty to formulate and enforce policies and procedures and that the Hospital was negligent in conducting peer review and credentialing:

(1) the Hospital's credential manual required (a) that its practitioners were

---

*nity Mem'l Hosp.,* 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965); *Foley v. Bishop Clarkson Mem'l Hosp.,* 185 Neb. 89, 173 N.W.2d 881, 884 (1970).

24. 947 S.W.2d 941.

25. *LaCroix,* 947 S.W.2d at 951. *See generally* 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.0332, at 67. JCAHO Accreditation Manual for Hospitals is a document that addresses the standard and characteristics of the expected elements of hospital-wide policies, departmental policies and procedures, and those of the medical staff as might be expressed in medical staff bylaws, rules, regulations, or policy. Such policy and procedure manuals

are hospital-specific and can be viewed as setting the standard of care for that institution. *LaCroix,* 947 S.W.2d at 951 n. 7.

26. 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.032, at 65. "[T]hese standards were formulated ... as *ultimate goals* and not as universal minimal standards." *Id.*

27. *LaCroix,* 947 S.W.2d at 950; *see also Air Shields, Inc.,* 590 S.W.2d at 576–81.

28. *Penn Tanker Co. v. United States,* 310 F.Supp. 613, 617–18 (S.D.Tex.1970).

29. *See LaCroix,* 947 S.W.2d at 951.

entitled to exercise only those privileges or specified services granted by the [governing] Board, (b) that privileges determinations were made by the Hospital through the observed clinical performance and the documented results of patient care evaluations and other quality maintenance activities required by the Hospital's bylaws.

(2) the Hospital's bylaws, rules, and procedures showed that the Hospital's stated policy for its medical staff was to strive to treat all patients admitted to or treated in any of the facilities, departments, or services of the Hospital with quality patient care as was commensurate with resources available; and that one of the purposes of the medical staff was to serve as a primary means of accountability to the [governing] Board to obtain a high level of professional performance of all practitioners authorized to practice in the Hospital through the appropriate delineation of clinical privileges and through an ongoing review and evaluation of each practitioner's performance in the Hospital.

(3) the Hospital's bylaws, rules, and regulations required the Hospital to establish peer review committees and hold meetings. The bylaws established an Executive Committee to take corrective action against a practitioner whenever his or her activities or professional conduct were detrimental to patient safety or to the delivery of quality patient care, or were disruptive to Hospital regulations. The bylaws also established a Surgical Specialities Department Committee that monitored the appropriateness of procedures performed and patient safety risk indicators of practitioners working in surgical services. The Surgical Specialities Department Committee was to review the reports of Quality Assessment and Improvement monitoring at each scheduled meeting to evaluate the effectiveness of the program, as well as determine areas where further review was indicated. Monitoring would thereafter continue to assure satisfactory correction or improvement.

(4) hospital bylaws also required annual staff meetings with an agenda including recommendations for maintenance and improvement of patient care. The bylaws provided the medical staff could, by resolution, provide the time for holding regular meetings, but the frequency of such meetings would be at least once a year. The bylaws also required the agenda of the regular staff meetings to include reports by responsible officers, committees, and departments on the overall results of quality assurance activities and other quality maintenance activities of the Staff, and on the fulfillment of other required Staff functions.

(5) special meetings of the medical staff could be called at any time by the [governing] Board, the president, the Medical Executive Committee, or not less than twenty percent of the active staff. Each member of the Staff category required to attend meetings pursuant to the bylaws was required to attend one annual meeting, at least fifty percent of all other medical staff meetings, at least three departmental meetings, and fifty percent of each committee meeting of which the doctor was a member. Whenever an apparent or suspected deviation from standard clinic practice was involved, special notice was given to the practitioner. The special notice stated the issue involved and stated that the practitioner's appearance was mandatory at the special meeting.

Michael White testified on the Millses' behalf. White was designated as a fact witness, not an expert witness. He testified that he had no knowledge of the Hospital's credentialing process, its policies or procedures, the adequacy of its equipment, or its requirements for continuing medical education.

Dr. Alfred Webster, chief of the surgical department from 1991 through 1993, testi-

fied that he assumed the Hospital attempted to comply with its bylaws, rules, and regulations. He did not testify that the Hospital failed to comply with the bylaws or standards in any specific way and did not testify that any failure proximately caused David's injuries.

Dr. Webster also testified he did not believe the Hospital reviewed his "preference card," a sheet of paper on which the doctor requests the equipment and items necessary for a surgical procedure. When asked whether the Hospital evaluated the equipment the doctors used in surgery, Dr. Webster testified that, once or twice a year, the doctors made requests for the Hospital to purchase new equipment, but he did not say the Hospital evaluated the equipment the doctors used. He testified the doctors told the Hospital what equipment they wanted the Hospital to purchase for their use.

Dr. Webster was asked whether the Hospital had any policy to prohibit him from using only a stethoscope during open heart surgery to monitor a patient's heartbeat. He testified that he did not know. Without expert testimony or other competent evidence on the standard of care for a hospital in formulating its policies and procedures, there was no evidence the Hospital owed a duty to David by requiring a doctor to use certain types of equipment and not others, or to perform certain types of surgical procedures and not others.

Even if the Millses presented evidence showing that an ordinary hospital would have required its surgeons to use certain techniques with certain equipment, the Millses still would have needed to present some evidence of probative force raising a fact issue on breach and proximate cause. However, we do not examine breach and proximate cause in the absence of a threshold showing of the standard of care for an ordinary hospital under the same or similar circumstances.

The Millses direct this Court's attention to *Air Shields, Inc. v. Spears* [30] in support of their contention that they presented evidence on a hospital's standard of care. In *Spears*, Southmore Hospital had policies and procedures addressing the percentage of exposure to supplemental oxygen for an infant in an incubator, but no policy addressing the duration of exposure to supplemental oxygen.[31] It was general medical knowledge at the time that the duration of exposure to supplemental oxygen was as dangerous as the percentage, and that oxygen should not be continuously given to infants in incubators.[32] Two other hospitals in Houston had policies designed to avoid the routine administration of oxygen.[33] The court held there was enough evidence to demonstrate negligence on the part of Southmore Hospital.[34] The distinction between the instant case and *Spears* is that in *Spears*, the plaintiffs presented evidence on the general standard of care for a hospital in formulating a policy for supplemental oxygen. The Millses presented no such evidence in the instant case. The Millses did not present evidence that other hospitals generally had policies or procedures directing doctors in their choice of equipment.

In *Hilzendager v. Methodist Hospital*,[35] the court indicated that the hospital's bylaws, absent more, may not indicate the standard of care for a hospital.[36] In the event the hospital's bylaws represented a standard much more stringent than the community at large, it would be against public policy to hold one hospital liable for conduct not measuring up to its own stan-

**30.** 590 S.W.2d at 578 (citing *Farley v. M M Cattle Co.*, 529 S.W.2d 751 (Tex.1975)).

**31.** *See id.* at 581.

**32.** *See id.*

**33.** *Id.*

**34.** *Id.*

**35.** 596 S.W.2d 284.

**36.** *See id.* at 286; *see also* 2 GRIFFITH & JOHNSTON, TEXAS HOSPITAL LAW § 3.032, at 64.

dards while holding another hospital free of liability based on less stringent bylaws.[37]

Despite the fact that the Millses pointed us to several places in the record as evidence on the standard of care for a hospital in the formulation and enforcement of its policies and procedures ensuring adequate peer review, the Millses have failed to present competent evidence of the standard of care for a hospital. The only evidence the Millses presented on duty of care in formulating and enforcing policies and procedures to ensure adequate peer review were the Hospital's bylaws, rules, and regulations. No witness, expert or otherwise, testified as to the general standard of care for a hospital (i.e., what an ordinary hospital would do under the same or similar circumstances) in formulating or enforcing policies and procedures, that the Hospital did not meet it, or that the Hospital's failure to meet the standard proximately caused David's injuries.

In *LaCroix*,[38] the plaintiffs argued, among other things, that the hospital breached its duty in failing to adopt, implement, or enforce policies about preanesthesia evaluation. In meeting their burden of showing the standard of care for a hospital, the plaintiffs introduced the American Society of Anesthesia guidelines, the hospital's rules, bylaws, and regulations, and medical expert testimony from physicians practicing in several areas of the state, including Fort Worth, Denton, Wichita Falls, Houston, and Dallas, on the general standard of care for a hospital in providing anesthesia to patients.[39] One of the experts testified that the standard of care was the same for a hospital in Denton, Irving, Lewisville, or Dallas.[40]

The Millses did present medical expert testimony that the doctors' use of a horseshoe headrest and tape, as well as the failure to use an arterial line, was below the proper standard of care for a doctor. They did not, however, present any medical expert testimony that a hospital's standard of care included formulating or enforcing a policy dictating the surgeon's choice of equipment. To the contrary, the plaintiff's medical experts testified that the ultimate responsibility for the type of equipment used rested with the physician. Dr. Mary Kathryn Hammock, the Millses' expert neurologist, testified that the ultimate decision on the equipment used and the position, i.e, whether sitting or prone, was that of the neurosurgeon. Dr. Kenneth Holder, an anesthesiologist called by the Millses, testified the surgeon chooses the head fixation device and the position. Julie Reyes, a neurosurgical nurse working for the Baylor College of Medicine, testified that the ultimate responsibility for the type of equipment used and the position of the patient rests with the surgeon. No evidence supported the Millses' contention that the Hospital failed to formulate or enforce policies or procedures to ensure adequate peer review and quality assurance (1) because the Millses failed to present evidence that an ordinary hospital in the same or similar circumstances would have been required to have a policy or procedure dictating the physician's choice of equipment or procedure, and (2) because the Millses' experts testified the physician has the ultimate responsibility for the equipment and procedure used.

Next, we will address the Millses' contention that the Hospital failed to provide adequate equipment. Hospitals have a duty to provide patients with appropriate and usable equipment.[41] The Millses contend the medical evidence at trial showed David's quadriplegia resulted from a combination of (1) the failure to secure his head rigidly during surgery, which resulted in excessive flexion of the neck and injury to the spinal cord, and (2) a failure

---

**37.** *Hilzendager,* 596 S.W.2d at 286.

**38.** 947 S.W.2d 941.

**39.** *Id.* at 951–56.

**40.** *See id.* at 954.

**41.** *LaCroix,* 947 S.W.2d at 950.

to maintain blood pressure at a sufficient level at the operative site, which caused a reduction in oxygen to David's spinal cord and resulted in death of the cells in the spinal cord.

The Millses presented evidence that the proper standard of care for a sitting position cervical laminectomy mandated the use of rigid skeletal fixation. Dr. Hammock testified that tongs, pins, or clamps provide rigid skeletal fixation and that the common denominator among these three devices was a sharp metal piece that penetrates the scalp and skull. The Millses contend skull pins, tongs, or clamps would have ensured rigid skeletal fixation and prevented David's quadriplegia, but the Millses allege these items were not available at the Hospital in 1993. Even if this evidence showed the proper standard of care for a hospital in that it was required to provide skull pins, tongs, or clamps for the surgeon's use, there is no evidence the Hospital breached this standard of care, because the record reflects skull clamps were available at the Hospital at the time of surgery.

The Millses further contend the anesthesia equipment used at the Hospital was outdated. They argue that a central venous line, an arterial line, or a Doppler device would have aided Dr. Wells in monitoring David's blood pressure, but these devices were not available at the Hospital. Dr. Phillipa Newfield, the Millses' expert anesthesiologist, testified that an arterial line is used to monitor blood pressure at the operative site, while a Doppler device and a central venous line are used to prevent air embolism. Dr. Holder testified that an air embolism is "where air gets sucked in the stem and it replaces blood in the stem and it causes a halt in the movements of blood throughout the body." One consequence of an air embolism is stroke. He also testified that he did not think an air embolism in any way caused David's quadriplegia. Dr. Newfield testified she assumed that because the Hospital handled big cases like David's, all three of

these items would be available for a doctor's use. Subsequently, however, she testified that she did not know if they were available at the time of David's surgery. The Millses did not point us to a place in the record affirmatively showing that a Doppler device or central venous line was not available at the Hospital, nor did the Hospital point us to a place in the record showing that they were available at the Hospital. Because a Doppler device and a central venous device are used to prevent air embolism and Dr. Holder testified that air embolism was not a factor in David's quadriplegia, we will not address the Millses' argument with regard to these two items. However, the record reflects that an arterial line was available in the room during David's surgery. Again, even if the evidence the Millses presented in support of this argument showed the standard of care for the hospital in supplying an arterial line, there is no evidence of breach of this duty because an arterial line was available. Dr. Wells used a blood pressure cuff and oscillator for blood pressure readings during the surgery, and he testified that, in his opinion, an arterial line was not necessary for David's surgery. In sum, skull clamps and an arterial line were available at the Hospital, but neither doctor chose to use them. The Hospital was not negligent in *failing* to provide these items, because they were available for the doctors' use, nor was the Hospital negligent in providing a horseshoe headrest, because witnesses testified the horseshoe headrest was used for other types of surgery, not just laminectomies in the sitting position. The Millses are really arguing that the Hospital was negligent in failing to require the doctors to use certain equipment. This argument is encompassed by our discussion on policies and procedures above and below in our discussion of credentialing and supervision.

 Third, we will address the Millses' contention that the Hospital was negligent in failing to require its doctors to attend continuing education. They argue Dr.

Wells should have followed a well-published formula to calculate blood pressure at the operative site, but Dr. Wells did not know how to calculate it. The only testimony the Millses elicited on continuing education was whether Dr. Wells and Dr. Angel attempted to stay abreast of new developments and how they did so.[42] The Millses did not present any evidence on the standard of care for a hospital in requiring continuing education, nor did they present any evidence that the Hospital breached the standard or that the breach proximately caused David's injuries. Accordingly, the Millses did not present any evidence of probative force raising a fact issue on the Hospital's negligence in failing to require continuing medical education.

 Last, we will examine the Millses' contentions that the Hospital was negligent in credentialing Dr. Angel and Dr. Wells, and that the Hospital failed to conduct regular peer review. Dr. Wells and Dr. Angel were independent contractors with staff privileges to practice at the Hospital. An employer must exercise reasonable care in the selection of a competent and careful independent contractor.[43] In a hospital setting, this rule translates into a duty by the hospital to exercise reasonable care in the selection and retention of physicians who are granted staff privileges.[44] In the present case, the Hospital, through its governing board, delegated this duty to a credentials committee made up of members of the medical staff. A physician's negligence does not automatically mean that the hospital is liable or vice versa.[45] A hospital should not second guess the performance of the physicians working in the hospital.[46] If a hospital did so, it would be ignoring the clear mandate in Texas that medical decisions are to be made by attending physicians.[47] Most hospital administrators are lay persons who lack medical training. For these reasons, the general rule is that a hospital is

---

**42.** Dr. Angel testified that neurosurgery does not have a recertification process where a doctor is required after so many years to take a test to be recertified. Dr. Angel testified he is a member of several groups, including the American College of Surgeons, American Association of Neurological Surgeons, and the Congress of Neurosurgeons. Dr. Angel testified that in order to continue to be a member of all of the groups, he must attend a certain number of meetings, present documentation of having taken a certain number of hours of postgraduate education every year, and read books, periodicals, and journals. Dr. Angel testified that a teaching process goes on at the annual meetings. He testified he attended the meetings regularly. Although Dr. Angel testified he does comply with these requirements to continue membership in the groups, this was not evidence of the standard of care for a hospital in requiring doctors with staff privileges at the hospital to attend continuing medical education.

**43.** RESTATEMENT (SECOND) OF TORTS § 411 (1965); *see Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 553 N.E.2d 1038, 1045 (1990), *overruled on other grounds, Clark v. Southview Hosp. and Family Health Ctr.*, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994) (citing H. Ward Classen, *Hospital Liability for Independent Contractors: Where Do We Go From Here?* 40 ARK. L. REV. 469, 474–75 (1987)).

**44.** *See Hickman,* 703 S.W.2d at 266, *disapproved by Agbor,* 952 S.W.2d at 509 n. 1; *Albain,* 553 N.E.2d at 1045 (citing *Taylor v. Flower Deaconess Home & Hosp.,* 104 Ohio St. 61, 135 N.E. 287 (1922); *Penn Tanker Co.,* 310 F.Supp. 613; *Mitchell Cty. Hosp. Auth. v. Joiner,* 229 Ga. 140, 189 S.E.2d 412 (1972); *Johnson v. Misericordia Community Hosp.,* 99 Wis.2d 708, 301 N.W.2d 156 (1981); *Fiorentino v. Wenger,* 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967)).

**45.** *See LaCroix,* 947 S.W.2d at 949; *see also Albain,* 553 N.E.2d at 1046 (citing *Crumley v. Mem'l Hosp., Inc.,* 509 F.Supp. 531 (E.D.Tenn.1978), *aff'd,* 647 F.2d 164 (6th Cir. 1981)); *see also Mooney v. Stainless, Inc.,* 338 F.2d 127 (6th Cir.1964).

**46.** *Boney v. Mother Frances Hosp.,* 880 S.W.2d 140, 144 (Tex.App.-Tyler 1994, writ denied); *see also Albain,* 553 N.E.2d at 1046; Gregory T. Perkes, *MEDICAL MALPRACTICE–OSTENSIBLE AGENCY AND CORPORATE NEGLIGENCE–Hospital Liability May Be Based on Either Doctrine of Ostensible Agency or Doctrine of Corporate Negligence,* 17 ST. MARY'S L.J. 551, 572 n.101 (1986).

**47.** *Boney,* 880 S.W.2d at 144. *See generally Albain,* 553 N.E.2d at 1046.

not liable for the negligent acts or omissions of independent physicians.[48]

 The Millses' credentialing claim can be separated into three parts: (1) negligence in the selection of Dr. Angel and Dr. Wells, (2) negligence in retaining them, and (3) negligence in failing to supervise them. As we stated earlier, the Hospital has a duty to exercise reasonable care in the selection and retention of physicians to whom it grants staff privileges. Expert testimony *is required* to establish liability in the area of credentialing, because the procedures ordinarily used by a hospital in evaluating applications for staff privileges are not within the realm of the ordinary experience of jurors.[49] An expert witness in a negligent credentialing case need not be a physician, but may be a witness who is familiar with the standard of care for credentialing because of his training and experience.[50]

In *St. Luke's Episcopal Hospital v. Agbor*,[51] the Texas Supreme Court held that the Texas Medical Practice Act's immunity provisions[52] prescribed a threshold showing of malice to state a cause of action against a hospital for its credentialing activities.[53] In so holding, the Court explicitly stated that to the extent other decisions such as *Park North General Hospital v. Hickman*,[54] *Lopez v. Central Plains Regional Hospital*,[55] and *Smith v. Baptist Memorial Hospital System*[56] conflict with its opinion, they are disapproved.[57]

The Legislature declared that one of the purposes of the Act was that separate laws regulating the practice of medicine should be brought together under one Act; that the Act was not intended to make substantive changes or alter prior judicial interpretation unless the subject matter in the Act was substantively changed or new matter was expressly added or old matter expressly deleted.[58]

"Medical peer review committee" or "professional review body" means a committee of a health-care entity,[59] the governing board of a health-care entity, or the medical staff of a health-care entity, provided the committee or medical staff operates pursuant to written bylaws that have been approved by the policy-making body or the governing board of the health-care entity and authorized to evaluate the *quality of medical and health-care services or the competence of physicians*, including those functions specified by Section 85.204,

48. *Baptist Mem'l Health Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex.1998); *Berel v. HCA Health Servs. of Texas, Inc.*, 881 S.W.2d 21, 23 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

49. *LaCroix*, 947 S.W.2d at 951; *Johnson*, 301 N.W.2d at 172; *Tottenham*, *supra* at 10–11.

50. *Lopez v. Central Plains Reg'l Hosp.*, 859 S.W.2d 600, 603–04 (Tex.App.-Amarillo 1993, no writ).

51. 952 S.W.2d 503 (Tex.1997).

52. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 5.06(*l*), (m) (Vernon Supp.1999).

53. *Agbor*, 952 S.W.2d at 509.

54. *Hickman*, 703 S.W.2d at 266 (holding the hospital had a duty to periodically review and monitor the activities of its staff physicians and holding the hospital had a duty to exercise care in the selection of its medical staff and in granting specialized privileges to them), *disapproved by Agbor*, 952 S.W.2d at 509 n. 1.

55. 859 S.W.2d 600 (holding that a material issue of fact about whether a hospital negligently credentialed a doctor precluded summary judgment).

56. 720 S.W.2d 618 (Tex.App.-San Antonio 1986, writ ref'd n.r.e.) (stating a hospital clearly may have a duty to prevent a physician's malpractice to the extent that it establishes procedures for the granting of staff privileges and for the review of these privileges).

57. *Agbor*, 952 S.W.2d at 509 n. 1.

58. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 1.02(4) (Vernon Supp.1999).

59. The hospital met the definition of a health-care entity as contained in the Act. *See* Tex. Rev.Civ. Stat. Ann. art. 4495b, § 1.03(a)(5) (Vernon Supp.1999).

Health and Safety Code,[60] and its subsequent amendments. Such a committee includes the employees and agents of the committee, including assistants, investigators, intervenors, attorneys, and any other persons or organizations that serve the committee in any capacity.[61]

"Medical peer review" or "professional review action" means the evaluation of medical and health-care services, including *evaluation* of the qualifications of professional health-care practitioners and of *patient care* rendered by those practitioners. The term includes evaluation of the merits of complaints relating to health-care practitioners and determinations or recommendations regarding those complaints. The term specifically includes evaluation of:

(A) accuracy of diagnosis;

(B) *quality of the care rendered by a health-care practitioner;*

(C) reports made to a medical peer review committee concerning activities under the committee's review authority;

(D) reports by a medical peer review committee to other committees or to the board as permitted or required by law; and

(E) implementation of the duties of a medical peer review committee by its members, agents, or employees.[62]

(Emphasis added.)

Any medical peer review committee in this state, . . . shall report relevant information to the board [Texas State Board of Medical Examiners][63] relating to the acts of any physician, . . . if, in the opinion of the medical peer review committee, . . . the physician . . . poses a continuing threat to the public welfare through the practice of medicine. . . . The duty to report under this section shall not be nullified through contract.[64]

A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination, or recommendation made, or act reported, *without malice,* in the course of peer review as defined by the Act.[65] A person, health-care entity, or medical peer review committee, that, *without malice,* participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.[66] Because of the foregoing language, the Texas Medical Practice Act applies to the actions of peer review committees in the selection, retention, and supervision of the medical staff.

The Millses contend that their presentation of evidence on the Hospital's bylaws,[67] the testimony of Michael White (director for resource in case management), and the testimony of Dr. Webster that the Hospital reviewed his medical charts and operative reports, established the standard of care of a hospital (i.e., what an ordinary hospital would do in similar circumstances). How-

60. Tex. Health & Safety Code Ann. § 85.204 (Vernon 1992).

61. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 1.03(a)(6) (Vernon Supp.1999).

62. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 1.03(a)(9) (Vernon Supp.1999).

63. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 1.03(a)(2) (Vernon Supp.1999).

64. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 5.06(d) (Vernon Supp.1999).

65. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 5.06(*l*) (Vernon Supp.1999).

66. Tex.Rev.Civ. Stat. Ann. art. 4495b, § 5.06(m) (Vernon Supp.1999).

67. The bylaws provided that the medical staff was to perform an ongoing review and evaluation of each practitioner's performance in the Hospital, the Surgical Specialties Department Committee had the responsibility for evaluating the quality of patient care and the appropriateness of procedures performed, and the Hospital's credentials manual provided that practitioners in the Hospital were entitled to exercise only those clinical privileges or specified services specifically granted by the governing board.

ever, this evidence does not establish what an ordinary hospital would do under the circumstances; it merely establishes what Bayshore Hospital did under the circumstances. Because the Millses did not present evidence on what an ordinary hospital would do, we cannot take the next step and reach their argument that the Hospital breached a duty it owed the Millses when, as the Millses argue, the Hospital allowed Dr. Angel and Dr. Wells to use equipment that was inappropriate for cervical laminectomies. Because expert testimony is required in credentialing actions, the Millses needed to present either an expert or someone familiar with a hospital's standard of care in the credentialing process. Neither White nor Dr. Webster was able to testify on the standard of care for a hospital in credentialing.

Further, the testimony by the Millses' experts that the doctors where negligent does not establish the standard of care for a hospital in the instant case. The testimony showing the doctors were negligent included (1) Dr. Hammock's statement that David's care fell below standard practice and that standard practice today requires the head be rigidly fixed with skull pins, (2) Dr. Holder's testimony that he had "never done a sitting position case" without an arterial line and that he felt the standard required use of an arterial line, and (3) Dr. Newfield's testimony that, in her opinion, it would not be an acceptable practice for doctors to utilize adhesive tape and a horseshoe headrest for a sitting position cervical laminectomy. Dr. Newfield also testified that the last time she had seen a cervical laminectomy performed without skull pins was twenty years earlier during her residency. As discussed earlier, other testimony the Millses presented showed that it was the doctors who had the ultimate responsibility for the equipment used and the patient's positioning, not the Hospital.

The Millses also contend that the Hospital had a duty to review Dr. Angel's preference card. In support of this contention,

the Millses argue they presented expert testimony that other hospitals, such as Methodist Hospital in Houston, maintain a centralized preference card system in which staff physicians "officially" list all the equipment they intend to use for each particular surgical procedure. They direct our attention to Dr. Hammock's testimony and Nurse Julie Reyes's testimony.

[TO DR. HAMMOCK]

Q: Thank you. One of the things the nurse does is also obtain from a surgeon's preference cards those pieces of equipment that he will utilize during the surgery?

A: That's correct.

* * * *

[TO DR. HAMMOCK]

Q: If a hospital—what is a preference card which was mentioned by one of the lawyers? What is a preference card, surgical preference card?

A: A surgeon who operates in a hospital and carries out certain procedures will have—for each of those procedures he does prefer instruments. Those will be written on a card that also includes sutures, materials for closing, what have you.

It is an official way for having things ready for that day so you don't have to recreate the procedure every time.

Those are procedure cards.

Q: Have you, on the preference card—does it normally mention the type of equipment a surgeon wants for the surgery—positioning equipment?

A: Yes, it does.

* * * *

[TO NURSE REYES]

Q: How do you go about doing that? How do you make sure everything is there?

A: Each surgeon working at Methodist Hospital has what is called a preference card. It is computerized. It is a computerized sheet that has the physi-

cian's name, the size gloves that he wears.

Then each procedure it lists the instruments that he uses, how he positions the patient, the equipment that he uses, any particulars.

It is his preference, that is why it is called a preference card.

This testimony does not show that an ordinary hospital reviews or has a duty to review a surgeon's preference card for each procedure. Nurse Reyes went on to explain that any nurse that is working with the equipment should be knowledgeable about the equipment. Despite this testimony, no witness testified that the standard of care for a medical staff or peer review committee required it to review preference cards. Dr. Webster testified that he did not believe the bylaw requiring an ongoing review and evaluation of his work required a review of the preference card and that he did not believe the Hospital reviewed his preference cards. Based on this testimony, the Millses did not show that the Hospital had a duty to review the doctors' preference cards.

Although the Millses presented the Hospital's bylaws concerning its credentialing processes, the Millses did not present evidence on what an ordinary hospital would do under the circumstances, i.e., they did not present evidence on the general standard of care for a hospital with respect to credentialing. Therefore, their argument that the Hospital was negligent in its selection, retention, and supervision of the doctors is without merit. Further, the foregoing evidence is also dispositive of the Millses' contention that the Hospital failed to conduct peer review to detect surgical and anesthesia problems in the operating room.

We need not address the Millses' contentions that we remand this case in the interests of justice to give them an opportunity to show that the Hospital, through its peer review committees, acted with malice in its credentialing process because the Millses did not show the Hospital was negligent in selecting, retaining, or supervising Dr. Wells or Dr. Angel. We also need not address the Millses' contention that there is a common-law cause of action for negligent credentialing in light of both the majority opinion in *Agbor*[68] and the Millses' failure to prove the standard of care for a hospital in the trial court.

The Hospital's negligence turned on the proper standard of care for a hospital in its credentialing activities and in its supervision of the doctors' performance of medical procedures. Here, expert testimony was required to shed light on the role the Hospital played in David's care. Therefore, the Millses' argument that expert administrative testimony was not required in the instant case because the Hospital's negligence was within the common knowledge of laymen is without merit. The Millses presented no competent evidence on the standard of care required of a hospital in the formulation or enforcement of it policies or procedures, in requiring continuing medical education, in peer review, or in credentialing. Nor did the Millses present evidence that the Hospital breached the standard of care when it provided, contrary to their contention, certain equipment for the doctors' use. Therefore, the trial court did not err in granting the directed verdict in favor of the Hospital on the Millses' bases of direct corporate liability.

The judgment is affirmed.

---

68. In *Agbor*, the court held that the Open Courts Provision was not violated because it could not conclude that negligent credentialing was a well-recognized common-law cause of action. *Agbor*, 952 S.W.2d at 508.