**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 02-50095
_____

ALFRED QUIJANO, SR., Individually and on behalf
of the Estate of Cristina Quijano, Deceased;
MICHAEL QUIJANO, and all other persons entitled
to assert a claim pursuant to the Texas Wrongful
Death Act; REYNALDO QUIJANO, and all other
persons entitled to assert a claim pursuant to
the Texas Wrongful Death Act; ALFRED QUIJANO, JR.,
and all other persons entitled to assert a claim
pursuant to the Texas Wrongful Death Act; LORNA
SHABO, and all other persons entitled to assert
a claim pursuant to the Texas Wrongful Death
Act; WILFRED QUIJANO, and all other persons entitled
to assert a claim pursuant to the Texas Wrongful Death
Act,

                                    Plaintiffs - Appellees,

versus

UNITED STATES OF AMERICA,

                                    Defendant - Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas

_____

March 19, 2003

Before HIGGINBOTHAM and DAVIS, Circuit Judges, and HUDSPETH*,
District Judge.

HUDSPETH, District Judge:

     Cristina Quijano, the civilian spouse of a retired Army

service member, underwent coronary artery bypass surgery at the

     *District Judge of the Western District of Texas,
      Sitting by designation.    1

Brooke Army Medical Center ("BAMC") in San Antonio, Texas. Following the surgery, she developed sepsis which was traced to a bacterial infection introduced through a blood transfusion. She died the day after surgery. Her surviving spouse and their adult children ("Quijano family") brought a wrongful death and survival action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ("FTCA"). Following a bench trial, the district court found in favor of the Quijano family, and awarded damages of $400,000. The United States appeals.

I. FACTS

On September 18, 1995, Mrs. Cristina Quijano, a 69 year-old woman, came to the BAMC Emergency Room complaining of chest pains. She was admitted to the hospital for tests. Those tests revealed blockage of the coronary arteries. The cardiologists recommended bypass surgery, which was scheduled for September 26, 1995.

On September 22, 1995, Quijano family members met with Dr. Alfred Gorman, one of the attending cardiologists. They requested the opportunity to give directed donations of blood[1] in case Mrs. Quijano should require a transfusion during or after surgery. That

---

[1]There are three basic sources of blood for transfusions. First, and most common, is the familiar voluntary blood donation which is typically stored with many other units of donated blood in a blood bank. The second category is autologous blood donation, meaning that the individual donates his or her own blood in advance of the contemplated surgery or other treatment. The third kind is directed donations, in which family members or friends donate blood which is earmarked specifically for the benefit of a particular patient, as was requested by the Quijano family in this case.

request was denied by Dr. Gorman.[2]  The family did not repeat the request to anyone else.

Mrs. Quijano's surgery was postponed three days, and was actually performed on September 29, 1995.  During surgery, she received a transfusion of two units of packed red blood cells.  A later investigation revealed that the blood had been donated by voluntary donors at Fort Hood Texas, and stored for 34 days.  The standard pre-transfusion inspection of the blood revealed no abnormality.  Nevertheless, Mrs. Quijano developed septic shock and died approximately 36 hours after surgery.  It was later determined that her death was caused by a blood-borne bacterial infection called Yersinia enterocolitica.  This bacteria is so rare it is believed to be present in only one out of one million units of donated blood and causes fatality in one out of nine million cases.

In 1995 there were no known screening tests for the presence of Yersinia in transfused blood other than visual inspection immediately prior to infusion.  The district court found no negligence in connection with the inspection performed in this case.  However, the district court found that BAMC was negligent in refusing the Quijano family's request for directed donation of blood for the benefit of Mrs. Quijano, and that such negligence was a proximate cause of her death.

---

[2]Dr. Gorman had no recollection of this conversation.  The district court's finding is based entirely on the testimony of Ray Quijano, Michael Quijano, and Alfred Quijano, Jr.

3

## II.  STANDARD OF REVIEW

We review bench trial findings of fact for clear error and conclusions of law de novo.  **Baby Dolls Topless Saloon v. City of Dallas,** 295 F.3d 471, 478 (5th Cir. 2002).

## III.  DISCUSSION

The FTCA authorizes civil actions for damages against the United States for personal injury or death caused by the negligence of a government employee under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred.  28 U.S.C. §§ 1346(b)(1); 2674. In this case, we apply Texas law.  Texas authorizes civil actions both for wrongful death and for the survival of actions for personal injury when the injured person dies.  Tex.Civ.Prac.& Rem. Code Ann. §§ 71.002(Wrongful Death Act); 71.021(Survivorship Statute).  When the negligence alleged is in the nature of medical malpractice, the plaintiff has the burden of proving (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury.  **Mills v. Angel,** 995 S.W.2d 262, 267 (Tex.App.-- Texarkana 1999, no. pet.); **Denton Reg. Med. Ctr. v. LaCroix,** 947 S.W.2d 941, 950 (Tex.App.--Fort Worth 1997, no pet.).  The standard of care is a threshold issue which the plaintiff must establish before the fact finder moves on to consider whether the defendant

4

breached that standard of care to such a degree that it constituted negligence. **Mills,** 995 S.W.2d at 268; **Denton Reg. Med. Ctr.,** 947 S.W.2d at 950. Expert testimony is generally required to prove the applicable standard of care. **Hood v. Phillips,** 554 S.W.2d 160, 165-66 (Tex. 1977); **Bowles v. Bourdon,** 148 Tex. 1, 219 S.W.2d 779, 782 (1949); **Mills,** 995 S.W.2d at 268. That testimony must focus on the standard of care in the community in which the treatment took place or in similar communities. **Birchfield v. Texarkana Mem'l Hosp.,** 747 S.W.2d 361, 366 (Tex. 1987); **Hall v. Huff,** 957 S.W.2d 90, 101 (Tex.App.–Texarkana 1997, pet. denied).

The district court found that in September 1995, the Food and Drug Administration had not promulgated any specific regulation applicable to directed donations of blood, nor had the American Association of Blood Banks adopted a policy with respect to the use of directed donations. The Plaintiff's expert, Dr. Dawson, testified that directed donations were safer than donations from volunteer donors; that in 1995, directed donations were generally accepted by hospitals around the United States; that a hospital policy highly discouraging directed donations would have been "unconscionable"; and that BAMC breached the applicable standard of care by failing to accommodate the Quijano family's request for directed donations. The Defendant's expert, Dr. Sandler, testified that directed donations of blood were not safer than volunteer donations; that in 1995, it might have taken up to ten working days

5

to process blood obtained through directed donations in order to verify its safety; that the standard of care with respect to directed donations differed from community to community and hospital to hospital around the country; and that BAMC's policies in 1995 were within the standard of care. The district court noted these conflicting expert opinions, but found that BAMC's own internal policy of highly discouraging, but not prohibiting, directed donations represented the standard of care, and that not allowing the Quijano family to give directed donations in this case violated the standard of care and was negligent. This was an erroneous application of Texas law. In Texas, a hospital's internal policies and bylaws may be evidence of the standard of care, but hospital rules alone do not determine the governing standard of care. **Mills,** 995 S.W.2d at 268; **Denton Reg. Med. Ctr.,** 947 S.W.2d at 951; **Hicks v. Canessa,** 825 S.W.2d 542, 544 (Tex.App. --El Paso 1992, no writ); **Hilzendager v. Methodist Hosp.,** 596 S.W.2d 284, 286 (Tex.Civ.App.--Houston [1st Dist.] 1980, no writ). A hospital might maintain a higher standard of care than the prevailing community standard. **Hicks,** 825 S.W.2d at 544; **Hilzendager,** 596 S.W.2d at 286. Because the district court's finding that BAMC policy established the applicable standard of care was clearly erroneous, we are required to remand the case to the district court. Upon remand, the court should consider whether the expert testimony offered by the parties established a community

6

standard of care and whether the actions of the Defendant's agents and employees breached that standard of care.

IV. CONCLUSION

The judgment of the district court is REVERSED, and this cause is REMANDED to the district court for further proceedings not inconsistent with this opinion.