ACCEPTED
12-15-00014-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
7/3/2015 10:40:18 AM
CATHY LUSK
CLERK

## NO. 12-15-00014-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
7/3/2015 10:40:18 AM
CATHY S. LUSK
Clerk

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER

**East Texas Medical Center d/b/a East Texas Medical Center
Emergency Medical Services**
*Appellant*

**v.**

**Jody Delaune, Individually and as Personal Representative of the Estate
of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune,
Destiny Delaune and Dee Ann Delaune, Minors**

*Appellees*

APPEAL FROM CAUSE NO. 13-0984-A
IN THE DISTRICT COURT OF SMITH COUNTY, TEXAS
7th JUDICIAL DISTRICT
HON. KERRY L. RUSSELL

**BRIEF OF APPELLEES**

RYAN KREBS, M.D., J.D.
State Bar No. 00792088
805 W. 10th Street, Ste. 300
Austin, Texas 78701
(512) 478-2072

*Counsel for Appellees*
*Jody Delaune, Individually; and as personal representative of the Estate of Crystal Delaune,
Deceased; and as Next Friend of Dalton Delaune, Destiny Delaune, and Dee Ann Delaune*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ………………………………………………………...ii

REQUEST FOR ORAL ARGUMENT…………………………………………..iv

SUMMARY OF THE ARGUMENT…………………………………………..2

ARGUMENT………………………………………………………………4

    I.       **Whether Judgment in Favor of Appellees Should be Reversed Because There is Legally Insufficient Evidence of Proximate Cause Against ETMC**

    II.      **Whether Judgment In Favor Of Appellees Should Be Reversed Because There Is Legally Insufficient Evidence Of The Applicable Standard Of Care And Breach By ETMC**

CONCLUSION………………………………………………………………..31

PRAYER………………………………………………………………….32

CERTIFICATE OF COMPLIANCE…………………………………………..34

CERTIFICATE OF SERVICE……………………………......................33

APPENDIX…………………………………………………………....Index Tab

    A.      **December 23, 2014 Final Judgment**

    B.      **November 24, 2014 Charge of Court completed by jury**

    C.      **July 28, 2014 Order Granting Defendants Moore and Spurgers' Motions for Summary Judgment**

# INDEX OF AUTHORITIES

**Case Law**

**TEXAS SUPREME COURT CASES:**

*Cash America v. Bennett*,
35 S.W.3d 12, 16 (Tex. 2000) …………………………………………………………….7, 11, 12

*City of Keller v. Wilson*,
168 S.W.3d 802,813 (Tex. 2005) …………………………………………………………25, 26

*In Re Merrill Lynch*,
235 S.W.3d 185, 188 (Tex. 2007) ……………………………………....................13

*Tanner v. Nationwide Mutual*,
289 S.W.3d 828, 830 (Tex. 2009) …………………………………………………………...31

*Wansey v. Hole*,
379 S.W.3d 246 (Tex. 2012) ………………………………………………….................9, 10, 11, 13

**TEXAS COURTS OF APPEALS CASES:**

*Aguilera-Sanchez*,
2003 Tex. App. LEXIS 4846 at *17 …………………………………………………………12

*Air Shields, Inc. v. Spears*,
590 S.W.2d 574, 581 (Tex. App. – Waco 1979, writ ref, nre) ……………………………7

*Carney v. Roberts Investment Co.*,
837 S.W.2d 206, 211 (Tex. App. – Tyler 1992, writ denied) ……………………………..9

*Chesser v. LifeCare Mgmt. Servs., L.L.C.*,
356 S.W.3d 613, 629 (Tex. App. – Fort Worth 2011, pet. denied) ………………………6, 12

*Ching v. Methodist Children's Hospital*,
134 S.W.3d 235, 241 (Tex. App. – Amarillo 2003, pet. denied) …………………………..30, 31

*Clark v PFPP Ltd. Partnership*,
455 S.W.3d 283, 287 (Tex. App. – Dallas 2015, no pet.) …………………………………10, 13

*Columbia North Hills Hospital v. Alvarez*,
2011 Tex. App. LEXIS 5908 *12-13 (Tex. App. – Fort Worth 2011, no pet.) ……………30

*Denton Reg'l Med. Ctr. V. LaCroix*,
947 S.W.2d 941, 950 (Tex. App. – Fort Worth 1997, pet. denied) ……………………7, 8, 9, 13

*Doege v. Sid Peterson Memorial Hospital*,
2005 Tex. App. LEXIS 4964 *21 (Tex. App. – San Antonio June 29, 2005, pet. denied) ..12

*Dunlap v. Young*,
187 S.W.3d 828, 836 (ex. App. – Texarkana 2006, no pet.) ………....................................5

*Durham Transportation, Inc. v. Valero*,
897 S.W.2d 404, 413 (Tex. App. – Corpus Christi 1995, writ denied) …………………....30, 31

*Gonzalez v. Willis*,
995 S.W.2d 729, 739 (Tex. App. – San Antonio 1999, no pet.) ………………………10, 11, 12

*Greater Houston Transportation v. Zrubek*,
850 S.W.2d 579, 591-92 (Tex. App. – Corpus Christi 1993, writ denied) …………………30, 31

*Latimer v. Memorial Hermann Hospital System*,
2011 Tex. App. LEXIS 423 (Tex. App. – Houston [14th Dist.] Jan. 20, 2011 no pet.) ……..8

*Leake v. Half Price Books*,
918 S.W.2d 559, 563 (Tex. App. – Dallas, no writ) ………………………………………...10, 13

*McCombs v. Children's Med. Ctr.*,
1 S.W.3d 256, 259 (Tex. App. – Texarkana 1999, pet. denied) …………………………….7

*The Methodist Hospital v. German*,
369 S.W.3d 333, 349-50 (Tex. App. – Houston [1st Dist.] 2011, pet. denied) ……………..10

*Mills v. Angel*,
995 S.W.2d 262, 269 (Tex. App. – Texarkana 1999, no pet.) ………………........................7, 30

*Tenet Health Ltd. V. Zamora*,
13 S.W.3d 464, 471 (Tex. App. – Corpus Christi 2000, pet. dism'd w.o.j.) ………………..6, 12

*Whitehead v. Tobias*,
7 S.W.3d 658, 662 (Tex. App. – Texarkana 1999, no pet.) ………………........................13

## CASE LAW FROM OTHER JURISDICTIONS:

*Moser v. Heistand*,
681 A.2d 1322, 1326 (Pa. 1996) ………………………………………………………………..8

iii

**Statutes**

Texas Good Samaritan Statute, Tex. Civ. Prac. & Rem. Code §74.152..2, 3, 4, 5, 6, 11, 12, 13, 32

Texas Medical Liability Act, Tex. Civ. Prac. & Rem. Code §74.351 ………......................23

**Other**

Dorsaneo, 20 Texas Litigation Guide §321.11[1][a]; …………………………………………..7

Edgar, Sales, Texas Torts & Remedies §4.01[4][d] ……………………………………………10

Griffith & Johnson, Texas Hospital Law – Liability And Damages §3.3 (3d ed. 2003); ……7

Penick, Medical Malpractice, 44 Texas Practice Series §1:27 (2010) ……………………….7

Perdue, Direct Corporate Liability Of Hospitals, 24 S. Tex. L.J. 773 (1983) .........................7

Prosser & Keeton On The Law Of Torts §30, at 165 (5th ed. 1984) ………………………….11

Tottenham, *Current Hospital Liability in Texas,* 28 S. TEX. L. REV. 1, 10 (1987) …………7, 8

<u>**REQUEST FOR ORAL ARGUMENT**</u>

The Plaintiffs-Appellees respectfully request oral argument, to assist the Court to more easily understand the factual and legal issues involved in this case, as described in this Brief.

_____

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER

_____

**East Texas Medical Center d/b/a East Texas Medical Center
Emergency Medical Services**
*Appellant*

**v.**

**Jody Delaune, Individually and as Personal Representative of the Estate
of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune,
Destiny Delaune and Dee Ann Delaune, Minors**

*Appellees*

_____

APPEAL FROM CAUSE NO. 13-0984-A
IN THE DISTRICT COURT OF SMITH COUNTY, TEXAS
7th JUDICIAL DISTRICT
HON. KERRY L. RUSSELL

_____

TO THE HONORABLE TWELFTH COURT OF APPEALS:

Plaintiffs-Appellees, Jody Delaune, Individually; and as personal representative of the

Estate of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune, Destiny Delaune,

and Dee Ann Delaune file this brief requesting that the Trial Court's judgment against Appellant

East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services

("ETMC") be upheld.  Appellees would respectfully show:

## SUMMARY OF THE ARGUMENT

Ours is a case arising from the death of Crystal Delaune, who was allowed to exit the back of a moving ambulance operated by ETMC, while Ms. Delaune was under the care of emergency medical service providers ("EMS Providers") employed by ETMC. Appellees originally brought claims against both the EMS Providers and ETMC, but Appellant sought and was granted partial summary judgment as to the EMS Providers, based on the Trial Court's finding that – under the Texas Good Samaritan Statute – the EMS Providers themselves could not be held personally liable for damages, absent a showing that their actions had been willful and wanton, and not merely negligent.

Thereafter, Appellees proceeded to trial on the theory that ETMC had violated the duty of care ETMC itself owed directly to Ms. Delaune, by failing to properly formulate, implement and enforce policies regarding the restraint of psychotic and/or delusional patients such as Ms. Delaune. The evidence produced at trial demonstrated that the EMS Providers continually sought to control Crystal Delaune solely by use of verbal techniques, despite Delaune's escalating agitation. Such agitation featured i) being forcibly tackled by a deputy sheriff; ii) screaming accusations that the attending EMS Provider was Satan, and intended to murder the ambulance driver; iii) demanding that the attending EMS Provider begin speaking in tongues; and iv) no less than three attempts by Ms. Delaune to exit the ambulance, including one while in motion, before the last and fourth exit to her death.

Throughout these cascading events, ETMC's EMS Providers fully recognized the danger that Ms. Delaune might attempt to jump out the ambulance's doors, and at one point stopped the ambulance to call for backup. Nonetheless, consistent with their training received from ETMC, the EMS Providers ultimately determined that Ms. Delaune's situation exhibited no need for

2

physical restraints, right up until the moment she jumped to her death. On the basis of such evidence, the jury found that EMTC's negligent implementation and enforcement of its restraint policies proximately caused Ms. Delaune's death, and awarded Appellees damages.

Now, Appellant has mounted an insufficient evidence challenge to the Trial Court verdict, focusing on two issues. First, Appellant asserts that – in granting partial summary judgment on its motion that the EMS Providers' behavior had not been willful and wanton (hence rendering them personally immune to liability, under the Good Samaritan Statute) – the Trial Court somehow also determined that the EMS Providers were likewise not guilty of merely ordinary negligence, as a matter of law. This representation is clearly false, as shown both by the relief requested by Appellant's own partial summary judgment motion, and the Trial Court's Order granting that motion.

Appellant then goes on to argue that, on proximate cause grounds, this supposed "no negligence" ruling likewise frees ETMC from all liability, citing a line of negligent hiring cases holding that an employer cannot be held directly liable unless its employee committed an "actionable tort". However, Texas case law makes clear that when hospitals like ETMC breach their policy-making duties, they can be held directly liable, even in the absence of any negligence by the hospital personnel carrying out such policies. Moreover, Appellees demonstrate herein that even if such "actionable tort" negligent hiring cases were applicable, these cases require only that – when a plaintiff sues an employer for the employer's own actions – the plaintiff must demonstrate that the employer's actions caused plaintiff to suffer an injury recognized in the common law. Such workplace cases do not additionally require the plaintiff obtain a freestanding jury finding establishing the negligence of the involved employees.

3

Appellant's second insufficient evidence challenge asserts that i) the expert testimony supplied by Appellees' expert Dr. Marvin Wayne failed to establish the applicable training-policy standard of care, while ii) other evidence in the Trial Court record established that ETMC did in fact teach its EMS Providers about other, non-verbal forms of restraint, and otherwise provided sufficient training regarding patient restraint issues generally. However, as shown by the testimony set forth herein, the common answer to both these challenges is that the *specific* defect plaguing ETMC's training policies was that they failed to ensure that its EMS Providers knew **when** to escalate to the use of physical restraints, as demonstrated by the tragic events of this case.

## ARGUMENT

### I. Whether Judgment in Favor of Appellees Should be Reversed Because There is Legally Insufficient Evidence of Proximate Cause Against ETMC

The first issue presented by Appellant consists of its argument that i) ETMC cannot be held liable for any failure to train its EMS Providers, unless such employees committed an "actionable tort", and ii) the Trial Court granted summary judgment as to Appellees' claims against the EMS Providers, such that iii) any failure-to-train by ETMC could not constitute a proximate cause of Crystal Delaune's death.

In response, Appellees would begin by pointing out that Appellant's entire "proximate cause" argument is premised upon Appellant's repeated, false assertion to this Court that "the trial court ruled prior to trial that the EMS Providers were not negligent as a matter of law". See pages 16, 23 and 32 of Appellant's Brief. The Trial Court did nothing of the sort; rather, by the very act of providing emergency care to Crystal Delaune, the ETMC employees in this case were found by the Trial Court to qualify for protection under the so-called 'Good Samaritan Statute',

4

Tex. Civ. Prac. & Rem. Code §74.152.  The relevant text of the Good Samaritan Statute provides that:

> emergency medical service personnel [such as the EMS Providers were found to be] are not liable for civil damages for an act performed in administering the care unless the act is willfully or wantonly negligent.

Unsurprisingly, Appellant sought to utilize the Good Samaritan Statute to dispose of Appellees' claims against its EMS Providers, by filing a motion explicitly titled "Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful and Wanton Negligence" ("PSJ Motion").  In its PSJ Motion, Appellant made no claim whatsoever that its EMS Providers were **not** guilty of garden-variety "ordinary" negligence, but rather that the Good Samaritan Statute reflected a public policy decision to impose a "***higher liability threshold of 'wilful and wanton negligence' rather than the standard threshold of ordinary negligence***."  (1 CR 42, 60)  Elsewhere, Appellant's PSJ Motion repeatedly equates the 'wilful and wanton' standard to that of "gross negligence" (1 CR 46, 52), and states that such higher statutory standard reflected a public policy decision aimed at preventing emergency caregivers from being penalized for 'judgment calls' made under the hectic conditions endemic to emergency care.  (1 CR 48, 60).  Accordingly, Appellant's PSJ Motion requested – and the Trial Court granted – a take-nothing judgment as to the EMS Providers, solely on the grounds that they were not willfully and wantonly negligent as a matter of law.  (1 CR 60-61; 2 CR 365).

Yet, Appellant now seeks to argue that its PSJ Motion somehow gave rise to a finding that the EMS Providers were likewise determined to be not guilty of ordinary negligence as well. Appellees will not belabor the obvious distinctions between ordinary negligence and 'wilful and wanton negligence', given that Appellant thoroughly addressed such at page 11 of its PSJ Motion (1 CR 46), citing *Dunlap v. Young*, 187 SW3d 828, 836 (Tex. App. – Texarkana 2006,

5

no pet.).  Appellees would only point out that the Good Samaritan Statute says nothing whatsoever to the effect that emergency medical service personnel are somehow magically prevented from acting in a manner constituting 'ordinary negligence'; rather, the Statute holds only that such personnel <u>cannot be held liable for damages</u> unless their errors rise to the level of 'wilful and wanton negligence'.

Thus, the Trial Court record contains no finding whatsoever that the EMS Providers employed by Appellant were **<u>not</u>** guilty of ordinary negligence in their care of Crystal Delaune. Instead, the Trial Court found only that the EMS Providers did not exhibit the conscious indifference that is the hallmark of the higher, *gross* negligence standard.  The record likewise shows no effort on the part of Appellant to require a jury finding as to the express issue of whether the EMS Providers were guilty of ordinary negligence.  Finally, at no time did Appellant argue that ETMC-as-entity was likewise a beneficiary of the Good Samaritan Statute, or that ETMC's policies themselves were *formulated, implemented or enforced* under emergency conditions.

To repeat, then, at p.16 of its Brief, Appellant explicitly premised its entire proximate cause argument on the Trial Court's supposed finding that "the EMS Providers were not negligent".  Given that such canard has been conclusively shown to be untrue, exactly what remains of Appellant's 'proximate cause' argument?  The short answer is: not much.

To begin with, Texas courts have repeatedly and consistently recognized that corporate health care entities such as the Appellant ETMC may be held **<u>directly</u>** liable for injuries arising from the negligent performance of their duties owed directly to a patient. *Chesser v. LifeCare Mgmt. Servs.*, *L.L.C.*, 356 S.W.3d 613, 629 (Tex. App. – Fort Worth 2011, pet. denied); *Tenet Health Ltd. v. Zamora*, 13 SW3d 464, 471 (Tex. App. – Corpus Christi 2000, pet. dism'd

6

w.o.j.); *McCombs v. Children's Med. Ctr.,* 1 S.W.3d 256, 259 (Tex. App. – Texarkana 1999, pet. denied); *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, pet. denied); *Air Shields, Inc. v. Spears*, 590 SW2 574, 581 (Tex. App. – Waco 1979, writ ref, nre); and Perdue, Direct Corporate Liability Of Hospitals, 24 S. Tex. L.J. 773 (1983).  Such duties owed by Appellant ETMC directly to its patients include those sued upon by Appellees, i.e. a duty to use reasonable care in formulating, implementing and enforcing the policies and procedures which govern its employees, such as the EMS Providers.  *McCombs*, 1 SW3d at 256; *Mills v. Angel*, 995 SW2d 262, 269 (Tex. App. – Texarkana 1999, no pet.); Penick, Medical Malpractice, 44 Texas Practice Series §1:27 (2010).

Given that the common law provides Appellees a direct cause of action to recover from ETMC, this Court must proceed carefully in reviewing Appellant's argument that such common law cause of action is automatically cut-off by the heightened protections which the Good Samaritan Statute extends only to the EMS Providers.  As noted in *Cash America v. Bennett*, 35 SW3d 12, 16 (Tex. 2000), abrogating a common law cause of action by reason of statutory enactments is disfavored, and such statutes will not be extended beyond their plain meaning.

Moreover, a necessary corollary to the common law's imposition of <u>direct</u> corporate liability upon healthcare entities such as Appellant is the principle that such hospital's direct liability is not dependent on a finding of negligence on the part of any other healthcare provider. *LaCroix*, 947 SW2d at 950; *Tenet*, 13 SW3d at 471; Dorsaneo, 20 Texas Litigation Guide §321.11[1][a]; Griffith & Johnson, Texas Hospital Law – Liability And Damages §3.3 (3d ed. 2003); and Tottenham, *Current Hospital Liability in Texas,* 28 S. TEX. L. REV. 1, 10 (1987). Indeed, the oft-cited *LaCroix* opinion explores this issue at length, in the course of upholding a jury finding that a hospital had negligently breached its duty to formulate policies regarding the

7

provision of anesthesia, despite the fact that (unlike the present dispute) the jury in *LaCroix* expressly found that the involved anesthesiologists and nurse had not been negligent; i.e., did not cut off causation.

Appellant's cursory attempts – at pp. 23-24 of its Brief – to distinguish the *LaCroix* result fall as flat as its assertion that Appellees somehow sued exclusively upon Appellant's 'failure-to-train' the EMS Providers specifically, rather upon Appellant's general failure:

> to formulate, implement, and enforce a policy requiring patients like Ms. Delaune, who are at risk of harming themselves and/or others, to be continuously restrained physically and/or chemically during transport.

See 9.02 of Appellees' Second Amended Petition (1 CR 32). Likewise, Appellant's straight-faced attempt to argue – at p. 24 of its Brief – that this Court should be guided instead by the "instructive and persuasive authority" in *Latimer v. Memorial Hermann Hospital System*, 2011 Tex. App. LEXIS 423 (Tex. App. – Houston [14th Dist.] Jan. 20, 2011, no pet.) is frankly embarrassing. *Latimer* is an unpublished two page opinion standing for nothing more than the proposition that a non-patient who is merely spoken to by a janitor while using a hospital's public toilet is not entitled to a million dollars.

As has been shown above, the result in *LaCroix* – i.e. that a hospital can be held directly liable for its failure to implement and enforce policy, even in the absence of negligence of any additional party – is no kind of isolated aberration, but is instead a necessary corollary to Texas's unquestioned adoption of the direct corporate liability doctrine, as discussed in the 1987 Tottenham law review article, written an entire decade before *LaCroix* was issued. 28 S. TEX. L. REV. at 10. See also *Moser v. Heistand*, 681 A.2d 1322, 1326 (Pa. 1996):

> A cause of action under corporate liability is based on the breach of non-delegable duties that a hospital owes directly to its patients, and is independent of the negligence of the hospital's employees or ostensible agents…The cause of action arises from the policies,

8

actions or inaction of the institution itself rather than the specific acts of individual hospital employees.

Nonetheless, Appellant argues at p. 24 of its Brief that the result in *LaCroix* should be treated as having been effectively overruled by the Texas Supreme Court's 2012 opinion in *Wansey v. Hole*, 379 SW3d 246 (Tex. 2012), which Appellant interprets as requiring that an employer cannot be held liable unless its employee is likewise held liable for an "actionable tort". We begin by noting that i) *Wansey* is confined to a negligent hiring context, ii*) Wansey* itself makes no mention whatever of *LaCroix*, iii) the tort alleged in *Wansey* is not a failure to formulate and/or enforce policy, much less training policy, iv) *Wansey* does not involve a healthcare setting, nor the 'direct corporate liability' doctrine applicable to health care entities such as Appellant; and v) no court has subsequently applied *Wansey* in any such relevant manner. For these reasons, Appellees would argue that this Court should resist facile applications of employer-liability concepts in the healthcare context, where scope-of-duty questions regarding hospitals routinely involve (literally) life-and-death issues more serious than whether *Wansey's* driving school instructor flirted with a teenage student. See *Carney v. Roberts Investment Co.*, 837 SW2d 206, 211 (Tex. App. – Tyler 1992, writ denied), recognizing that an employer's duty to ensure the proper training of his employees applies with heightened force "where engaged in an occupation which could be hazardous to life and limb and requires skilled to experienced servants."

Caution is especially appropriate in our "failure to implement and enforce policy" context, where it is hardly difficult to imagine numerous scenarios – such as those involving policies relating to improper training, or insufficient staffing – which could proximately result in dire injuries to the patient, even though the actionable negligence lay diffused among the hospital's policymakers, and not those undertrained or understaffed hospital workers who

9

actually dealt with the injured patient. If, for example, a hospital seeking to cut costs placed a novice nurse in sole charge of its neonatal ICU, and an infant died as a result, would a novice unwillingly thrust into such role be *personally* liable for negligence and, if not, should the hospital thereby be allowed to evade all liability for the hazard its own policies created?

Moreover, even assuming this court does sees fit to apply *Wansey* to the present healthcare dispute, the court's careful review will find that *Wansey* simply does not stand for what Appellant claims it does. That is, Appellant repeatedly asserts that ETMC cannot be held liable for any failure to implement and enforce proper policies regarding patient restraint, unless its EMS Providers committed an "actionable tort" while caring for Ms. Delaune. However, in reviewing both *Wansey* and the innumerable cases cited by Appellant at pp. 20-21, it is seen that in requiring an "actionable tort", Texas courts have consistently focused not upon the employee's culpability, but rather upon requiring a showing that i) the plaintiff suffered a genuine, legally recognized **injury**, and ii) that that injury directly resulted from the employer's failure to take the action complained of. *Wansey*, 378 SW3d at 247-48; *Gonzalez v. Willis*, 995 SW2d 729, 739 (Tex. App. – San Antonio 1999, no pet.); *The Methodist Hospital v. German*, 369 SW3d 333, 349-50 (Tex. App. – Houston [1st Dist] 2011, pet. denied). Accord, Edgar, Sales, Texas Torts & Remedies §4.01[4][d], at p. 4-10: "Without an actionable tort, the plaintiff has not been **injured** in the eyes of the law. Therefore, the employer's negligence did not cause a legally compensable **injury**" (emphasis added). Indeed, Appellant's own *Clark v. PFPP Ltd. Partnership*, 455 SW3d 283, 287 (Tex. App. – Dallas 2015, no pet.) holds that "Negligent hiring, supervision, and retention claims focus on the employer's own negligence, not the negligence of the employee", citing *Leake v. Half Price Books*, 918 SW2d 559, 563 (Tex. App. – Dallas, no writ).

10

In short, the true focus of these "actionable tort" cases is establishing a proximate causality between the employer's behavior and the plaintiff's harm. Had ETMC's policies strictly required that its ambulances be painted yellow, for example, yet Ms. Delaune died while exiting one that was painted red, there would obviously be a fatal disconnect between the unenforced policy provision, and the harm sued upon. See Prosser & Keeton On The Law Of Torts §30, at 165 (5th ed. 1984), as cited by the *Gonzales* court, 995 SW2d at 739. Appellees in no way question this need for a valid causal link between Appellant's failure to implement and enforce a proper restraint policy, and Ms. Delaune's death. Indeed, in the next section of this Brief, Appellees extensively highlight the evidence in the Trial Court record which establishes such causal link.

Appellant, on the other hand, desires *Wansey* and the accompanying "actionable tort" cases to say something they do not say, i.e. that ETMC itself cannot be held liable unless the Appellees secure a specific jury finding that the EMS Providers were themselves negligent, and is awarded damages against the EMS Providers. More specifically, under the facts our case, what Appellant appears to be arguing is that ETMC itself cannot be held liable – for the injuries the jury found its policy implementation and enforcement failures to have inflicted upon Crystal Delaune – solely because a special Good Samaritan Statute gave Appellant's employees (but not Appellant itself) limited immunity protection from **damages** resulting from those employees' actions. However, Appellant wholly fails to cite any case law espousing the principle that statutory damage-immunity prevents an "actionable tort" from occurring, whereas as *Cash America v. Bennett*, 35 SW3d at 16, argues directly against such result.

Indeed, Appellants' own cases repeatedly make clear that the heart of the "actionable tort" requirement is a showing that, via the instrumentality of the employee's acts, the plaintiff

11

suffered an injury recognized **at common law**.  *Aguilera-Sanchez*, 2003 Tex. App. LEXIS 4846 at *17; *Gonzalez*, 995 SW2d at 740. See also *Doege v. Sid Peterson Memorial Hospital*, 2005 Tex. App. LEXIS 4964 *21 (Tex. App. – San Antonio June 29, 2005, pet. denied).  There can be no serious question that the *harm* suffered by Crystal Delaune constitutes an injury recognized in common law, even if a special statutory enactment bars Appellees' ability to recover *damages* for such  harm from the EMS Providers themselves.  *Chesser*, 356 S.W.3d at 629; *Tenet Health Ltd.*, 13 SW3d at 471.  As already noted, Texas disfavors any finding that a statutory tightening of Appellees' right-to-recover against the EMS Providers (via the Good Samaritan Statute) should also abrogate its common law right to recover from ETMC.  *Cash America*, 35 SW3d at 16.

Last, conscience requires Appellees to take issue with Appellant's contention – at p. 23 of its Brief – that because the Good Samaritan Statute shields ETMC's EMS Providers from damages for  paramedical 'judgment calls' made *in extremis*, Appellant itself, in implementing and enforcing its policies at its leisure, should likewise be free to subject its patients to all degrees of negligence short of the willful and wanton variety, by reason of the lesser   "standard of care" supposedly established by the Good Samaritan Statute; i.e., Appellant argues it can get away with more.   However, Appellant has advanced no rationale as to why ETMC's policy-related actions should likewise be protected under the Good Samaritan Statute's "willful and wanton" standard, whereas the law is clear that the policy-related duty of care owed by ETMC directly to its patients is measured under a stricter, ordinary negligence standard. *Chesser*, 356 S.W.3d at 629; *Tenet Health Ltd.*, 13 SW3d at 471. Thus, as Appellant seeks to clothe itself – by proxy – in the Good Samaritan immunity extended only to its EMS Providers, Appellees would again point out that Appellant's own authorities hold that the courts should properly "focus on

12

the employer's own negligence, not the negligence of the employee". *Clark*, 455 SW3d at 287; *Leake*, 918 SW2d at 563.

Ultimately then, ours is a case where Appellant itself submitted the special issue under which the jury found ETMC guilty of negligence which proximately caused the death of Crystal Delaune, with the accompanying instructions making clear that the "ordinary care" required of ETMC referred to the manner in which it implemented and enforced its policies. (2 CR 375) There can be no question that under Texas law i) a corporate entity such as ETMC can only act through its human agents, and ii) an event can have more than one proximate cause. *In Re Merrill Lynch*, 235 SW3d 185, 188 (Tex. 2007); and *Whitehead v. Tobias*, 7 SW3d 658, 662 (Tex. App. – Texarkana 1999, no pet.). Accordingly, Appellees are unaware of any need for any additional, specific findings as to the ordinary negligence of the EMS Providers who treated Crystal Delaune, in order to establish the 'proximity' already found by the jury.

Although the Trial Court did indeed determine on summary judgment that the EMS Providers were not guilty of 'wilful and wanton' conduct, ETMC's own policy-related duties owed to Crystal Delaune incorporate an ordinary negligence standard, such that there is no relevant 'dissonance' between the summary judgment findings as to the EMS Providers, and jury findings as to ETMC. Had the EMS Providers, in fact, been found not guilty of ordinary negligence, then this Court might have been required to examine more closely the interaction between the *LaCroix* and *Wansey* precedents discussed above. Even then, the proximate cause of Crystal Delaune's death was the negligent failure by ETMC to train its EMS Providers when to use physical restraints. However, the short and definitive answer to Appellant's opening "proximate cause" challenge is that the EMS Providers were never deemed absolved of ordinary negligence, and therefore their protection under the Good Samaritan Statute in no way liberates

13

their employer ETMC from the consequences of the jury's finding that Appellant negligently failed to fulfill its own policy-related duties owed directly to Crystal Delaune.

**II.     Whether Judgment In Favor Of Appellees Should Be Reversed Because There Is Legally Insufficient Evidence Of The Applicable Standard Of Care And Breach By ETMC**

The second issue presented by Appellant consists of its argument that Appellees supplied legally insufficient evidence that ETMC failed to implement and enforce policies regarding the use of restraints by its EMS Providers when dealing with psychotic and/or delusional patients such as Crystal Delaune.  In connection with such 'insufficient evidence' argument, Appellant advances three distinct sub-arguments: i) Appellees' expert Dr. Wayne offered only conclusory statements; ii) the evidence at trial supposedly established that the EMS Providers knew about the use of restraint; and iii) the testimony of Appellees' expert Dr. Wayne supposedly involved improper 'inference stacking'.  In responding to this issue, it will be helpful to review the operative sequence of events, the trial testimony of the attending EMS Provider Linda Moore, and the testimony of Appellees' expert witness, Dr. Wayne.

**OPERATIVE SEQUENCE OF EVENTS**

Ours is a case where the EMS Providers intentionally chose not restrain their patient Crystal Delaune, in favor of relying exclusively on the "talk down" technique, despite an ever-escalating series of warning signs that Crystal Delaune intended to exit a speeding ambulance.  That is, as regards the eleven minutes between Crystal's first meeting with Appellant's EMS Providers, and her leap that resulted in her death, evidence was presented that:

> Prior to arrival, the EMS Providers had already been informed by their dispatcher that Crystal Delaune was exhibiting abnormal behavior (3 RR 100, 101);

> Upon first encountering her, the EMS Providers found Crystal Delaune confined in a sheriff's car (3 RR 101);

14

As the EMS Providers attempted to escort her from the sheriff's car to the ambulance, Crystal Delaune intentionally fell to the ground (3 RR 107, 192);

Prior to departure, Crystal Delaune twice attempted to escape from the ambulance (3 RR 109, 121; 5 RR 145-46);

In response to one such escape, the sheriff placed a chokehold on Crystal Delaune and violently threw her to the ground (3 RR 109, 194-95);

The EMS Providers admitted they never succeeded in establishing a "reality base" with Crystal Delaune (2 RR 240; 3 RR 206);

The EMS Providers believed that Crystal Delaune was confused, delusional and suffering from psychosis (2 RR 239, 241; 3 RR 97, 108, 119, 188);

The attending EMS Provider thought Crystal Delaune was "out of her head and just basically didn't know what she was doing" (3 RR 124);

The attending EMS Provider agreed that Crystal Delaune's psychosis caused her to alternate between communicating rationally and spouting "crazy stuff";
(2 RR 241)

Approximately four miles from the pickup point, Crystal Delaune unbuckled her straps in the moving ambulance, sat on the edge of the stretcher, and announced that she wanted to get out of the ambulance (3 RR 114-15, 117, 121, 196-97);

In response to Crystal Delaune's third attempt to exit the speeding ambulance, the EMS Providers locked the ambulance's rear doors to slow any attempted exit by Crystal Delaune (2 RR 236; 3 RR 117-18, 121);

In response to Crystal Delaune's third attempt to exit the speeding ambulance, the EMS Providers stopped the ambulance and called the sheriff for backup, but later chose to proceed without such help (3 RR 116-17);

Crystal Delaune began loudly accusing the attending EMS Provider of being Satan, of intending to murder her fellow EMS Provider, and demanded that such attending EMS Provider begin speaking in tongues (3 RR 97, 118-19, 197-98);

Crystal Delaune began jabbing her hand into the face of the attending EMS Provider, and screaming that she is going to go to hell (3 RR 118-20);

Having never been restrained, Crystal Delaune got off the stretcher, unlocked the doors of the speeding ambulance and jumped out to her death (3 RR 121-23).

Thus, despite this wealth of indicators that Crystal Delaune intended to forcibly exit the ambulance, the EMS Providers testified that the actions, or more accurately, inaction taken by them in not physically restraining Crystal Delaune were entirely consistent with the training they received from ETMC.

Accordingly, at issue in the trial was the very narrow question of whether ETMC had properly implemented and enforced policies as to when its EMS Providers should have abandoned the "talk down" approach used exclusively upon Crystal Delaune, and advanced to applying physical restraints which would have prevented her death.

**RELEVANT EXCERPTED TESTIMONY OF EMS PROVIDER LINDA MOORE**

Linda Moore, the EMS Provider who attended Crystal Delaune during the ambulance ride, testified to the following:

Q      How were you trained as to when to use the talk-down technique?

A      At all times.

Q      So not only at the scene, but when you are transporting, correct?

A      Correct.
(2 RR 239)

Q      Okay.  Do you agree that what you told me in your deposition, when I took it, was that you are going to keep trying the verbal or talk-down until it completely doesn't work; just keep trying – keep trying that, right?

A      Yes, sir.

Q      And that's because of the way you were trained?

A      Correct.
(3 RR 98)

Q      I think you told me in your deposition, "I've been taught to use verbal commands all the way through." Right?

A      Correct.

16

(3 RR 99)

[*After Crystal Delaune removed her seat belts, swung to the side of her stretcher in the moving ambulance and announced she was going to exit the ambulance, the EMS Providers locked the rear doors to prevent Crystal Delaune's escape, and made a call for assistance. Nonetheless, the EMS Providers continued to rely on the talk-down technique exclusively.*]

Q    Because that's the way you'd been trained, isn't it?

A    Yes.

Q    You thought that was working?

A    Yes.

Q    So keep doing it, because that's the way you were trained?

A    Yes sir.
(3 RR 116)

Q    In your training, going back to the '70s, were you ever taught that there was any number of times after which you stopped the verbal technique, the talk-down technique first?

A    No, sir.
(3 RR 149-50)

Q    What was your training and your understanding as to when and how to restrain patients?

A    It's been the same. You talk to the patient first. Always.

Q    Okay. And then when do you go to restraints?

A    When they become physical to you or themselves.
(3 RR 163)

[*Appellant's counsel questioned Linda Moore concerning Crystal Delaune's condition after her third attempt to escape the ambulance, and her loud accusations that Linda Moore was Satan and intended to kill the ambulance driver.*]

Q    Up to this point in time, based on your training and education, experience from ETMC and before, can you tell the ladies and gentlemen if, in your opinion, she was being cooperative with you?

17

A      She was cooperative the whole time with me.

Q      And up to this point in time, based on your training and education, experience, even before ETMC, was she responding to the verbal first technique?

A      She responded to verbal commands each time.
(3 RR 200)

Q      -- in your opinion, did you attend to Ms. Delaune in a manner that you believe to be consistent with ETMC's behavioral disorder's protocol?

A      Yes, sir.
(3 RR 202)

*[Appellees' counsel further questioned Linda Moore as follows]*

Q      …way back when Mr. Thiebaud asked you about how you were trained by East Texas Medical Center EMS, you answered – and maybe even slipped a little bit – but you said, "Talk-down at any cost". Didn't you?

A      Yes, sir. Probably did.
(3 RR 210)

In short, EMS Provider Linda Moore repeatedly testified that – pursuant to the training she received from ETMC – her continued reliance solely upon the "talk-down" technique was fully appropriate. Moore further testified that pursuant to her training, no escalation to physical restraints was called for, despite i) Crystal Delaune's psychotic state; ii) her repeated attempts to exit the ambulance, including while the ambulance was speeding, iii) her declaration that she would exit the ambulance, and iv) the fact that Linda Moore foresaw that Crystal Delaune could quickly injure herself by exiting the speeding ambulance. Rather, the testimony supplied by Linda Moore indicated that she had been trained to continuously rely on the talk-down technique in essentially "amnesiac" fashion, that is with no regard whatsoever to a psychotic patient's immediate history of escalating noncooperation, nor to the dangers presented by a moving ambulance.

18

Q        Does that mean one time; and then after that you're off to physical and chemical restraints?

A        Verbal is every time that you can talk with them and get them to calm down.

Q        Each time?

A        Each time.
(See 3 RR 189)

At 3 RR 204-05, Appellees' attorney walked EMS Provider Linda Moore through the entire history of Crystal Delaune's psychotic and noncooperative behavior on the night of her death, in an attempt to determine "How many verbal firsts do you get?", before physical restraints become necessary. Moore replied that "[t]here were verbal firsts every time that was appropriate", until Crystal Delaune made her final, fatal lunge out the ambulance's backdoor: "At that time, the verbal was me asking her to stop, and, no, she did not stop".  (3 RR 205)

**RELEVANT EXCERPTED TESTIMONY OF APPELLEES' EXPERT DR. WAYNE**

In reading EMS Provider Linda Moore's earlier deposition testimony, Appellant's expert witness Dr. Wayne had been struck by the very same "repetitive focus" on the use of talk-down technique exclusively, as would be again demonstrated in the EMS Provider's trial testimony highlighted above.  In his own trial testimony, Dr. Wayne stated the following:

> If you read their [EMS Providers] depositions, they repetitively talk about a single therapy or therapeutic approach – process approach to a behavioral emergency.  If that's the only basis and understanding they have, then, clearly, their education has failed them. (3 RR 20-21)

> So clearly, in reading their depositions, the only thing that repetitively came up was: We talk them down.  And the question was raised to them: "Well what happens if you talk them down and they're not doing" –

> "Well we continue to talk them down"

> So, to me, the next two steps that should have occurred, they did not possess and were not clearly tested that they had received and understood that knowledge of the critical next steps when talking down didn't work.

19

(3 RR 22)

Q    Okay.  And when talking-down is not working, what's the next step.

A    Little bit depends.  It depends on, if that patient's going to be transported, who's going to transport that patient … assuming that you, as the EMS provider, are going to transfer the patient, the next step is to place the patient into some form of a restraint.
(3 RR 23)

Q    Let me ask you, at this point, if Crystal Delaune had had restraints on during that ambulance transport, would she be alive today?

A    Presuming that no other cause would have harmed her, the answer is yes.
(3 RR 25)

Q    In reviewing the testimony of Linda Moore and Lindy Spurgers, did they ever indicate that they were trained on when restraints are needed or necessary according to this policy?

A    Well, as stated there in the report and in their deposition, they repetitively mentioned the process of using talk-down.  They never described any other technique for handling the behavioral emergency.

So while this may be presumptuous, I think it's honest in saying that if they didn't discuss any other methodology when they were queried in their deposition, I would assume that they didn't have the intrinsic knowledge, the ability to know to go to the next step.
(3 RR 29)

Q    Okay.  Now, with respect to the standard of care, did the standard of care yet require restraints of the time Crystal had tried to get out of the ambulance twice there at Running Rudy's parking lot?

A    In my interpretation, yes.
(3 RR 33-34)

[*Dr. Wayne stated that Crystal Delaune should have been put in four-point restraints after she got off the stretcher while the ambulance was moving.*]

Q    And in terms of Linda Moore's training, why didn't that happen?

A: Well, I can't read her mind, but I can only state what she said in her deposition.
She said, "I was taught to talk-down.  Keep talking-down and keep talking-down."
And there's nowhere in her deposition where she states that she was taught anything beyond talk-down.

Q       Was it well below the standard of care for East Texas Medical Center to not train Linda Moore and Lindy Spurgers to restrain Crystal at this point?

A       Well, the answer is "yes", but it has two facts to it.

Q: What are those –

A: Okay. Fact one is what your pieces of paper say and what you teach.  Fact two is assessing that those people have understood that knowledge.  So I don't doubt that East Texas Medical Center's documentation that we all saw is what their documentation is.
My concern is that – and my feeling where the failure of standard of care occurred is that if the EMS providers only knew to talk-down, they had not been taught.  The paper says that's why you do, but the education wasn't there to validate that piece of paper.
(3 RR 35-36)

Q       So based on the testimony of Linda Moore and Lindy Spurgers, do you have an opinion on whether East Texas Medical Center EMS deviated from the standard of care by not properly training Linda Moore and Lindy Spurgers on when to use restraints on patients like Crystal Delaune?

A       Well, based on the information provided in their depositions and the events that occurred, I would have to say yes.

Q       Okay. So what is your opinion?

A       My opinion is – again, we have a paper here saying: This is what we teach.  We had actions and testimony from certainly honest EMS providers, "That's not what we knew."

Q       Okay.  This is similar, but I need to ask this question. Based on the testimony of Linda Moore and Lindy Spurgers, do you have an opinion on whether East Texas Medical Center EMS failed to use ordinary care by not properly training Ms. Moore and Ms. Spurgers on when to use restraints on patients like Crystal Delaune?

A       Well, since I'm not sure the difference is – the answer would still be yes.

Q       Okay. And so what is the opinion?

A       My opinion is, again, we have the discrepancy between performance and teaching – or at least paper education.  I mean – and I'm not being disrespectful to East Texas Medical Center.  I'm sure they're good people – good, caring people.  The paperwork says: This is what we teach.  The knowledge based by two EMS providers – not one but two – say, "That's not what we knew."  So based on those pieces of information, I would say, yes, they fell below the standard of care.

Q      All right.  And let me ask you, based on the testimony of Linda Moore and Lindy Spurgers, do you have an opinion on whether East Texas Medical Center EMS was negligent in failing to properly train Ms. Moore and Ms. Spurgers on when to use to use restraints on patients like Crystal Delaune?

A      I think we're going to have to get a definition of "negligent". But I understand we're in a court.  I understand the terminology –

Q      So let me ask you to assume that "negligent" means failure to use ordinary care or a deviation from the standard of care.

A      And the answer there would be yes, with that definition.

Q      Okay. So just so we're clear for the record, what is your opinion?

A      My opinion is that if we're defining negligence in this case as failure to appropriately educate so they had the predicate knowledge to know what to do beyond talk-down, the answer is yes.
(3 RR 41-44)

Q      Okay. Was it foreseeable to an ordinarily prudent EMS provider, such as East Texas Medical Center EMS, that if it didn't properly train its EMTs and paramedics regarding when to use restraints on its patients, that harm might reasonably come to the EMTs or paramedics, a patient like Crystal Delaune, or the public?

A      I've got to walk through that in my mind for a second.

Q      Okay.

A      I think we're really saying the same thing again. Education didn't match knowledge. And in that case the answer is yes.

Q      And with respect to that harm, was it foreseeable to an ordinarily prudent EMS provider, such as East Texas Medical Center EMS, that if it didn't properly train its paramedics, that harm could include something like what happened in this case? Patient could go out the back of an ambulance?

A      Well, let me predicate that by saying that's why we teach people to follow the pathways to protect the patients and themselves; so, therefore, the answer is yes.
(3 RR 44-45)

Q      Do you have an opinion, in reasonable medical probability, on whether the failure of East Texas Medical Center EMS to properly train Linda Moore and Lindy Spurgers on when to use restraints caused Linda Moore and Lindy Spurgers not to restrain Crystal Delaune?

22

A    Again, here's what I'm using for the predicate to give my answer: Their depositions, where they continually only talked about the talk-down approach and never discussed alternative therapies; and based on that fact, the answer would be yes.

Q    Okay. And so then the next step is: Do you have an opinion…in reasonable medical probability on whether the failure by East Texas Medical Center EMS to properly train Linda Moore and Lindy Spurgers, that failure then led to Crystal Delaune to be able to go out the back of the ambulance to her death?

A    Yes.

Q    And what is that opinion?

A    Yes.

Q    Okay. Let me ask you then, do you have an opinion on had East Texas Medical Center EMS properly trained Linda Moore and Lindy Spurgers about when to use restraints, is it probable Crystal Delaune would not have been able to go out the back of the ambulance to her death?

A    Yes, that is probable.
(3 RR 45-46)

At pp. 26-27 of its Brief, Appellant asserts that the trial testimony supplied by Appellees' expert Dr. Wayne supposedly failed to meet the applicable evidentiary burden of demonstrating the actual, factual specifics of the duty of care ETMC owed to its patient Crystal Delaune, in implementing and enforcing its policies regarding training its EMS Providers on the use of restraints when caring for psychotic and/or delusional patients such as Crystal Delaune.

In support of this alleged 'heightened specificity' standard, however, Appellant almost entirely relies upon cases where one litigant sought to dispose of a case prior to trial based solely upon the contents of a physician's CPRC §74.351 report, such as when i) a party seeks summary judgment, or ii) where a court scrutinizes whether the plaintiff's initial CPRC §74.351 expert report (statutorily required to be submitted in all healthcare liability cases) satisfies the requirements of the governing Texas Medical Liability Act, CPRC §74.351. Long story short, the cases cited in its Brief give no support whatsoever to Appellant's assertion that an expert

23

witness's *live trial testimony* is held to any heightened specificity requirement concerning the applicable standard of care.

Moreover, even if such a specificity requirement did apply here, the excerpted Wayne testimony set out immediately above clearly indicates that under the applicable standard of care, the training policies implemented and enforced by ETMC should have made sure that its EMS Providers learned when and how to advance to the next step (i.e. physical restraints) after their initial verbal, "talk-down" technique ceased to be appropriate. (3 RR 22, 29, 44) Dr. Wayne further testified that – in Crystal Delaune's case – such talk-down technique ceased to be appropriate when Delaune twice exited the <u>parked</u> ambulance (3 RR 33), and became unquestionably inappropriate once Delaune made a third attempt to exit the ambulance as it sped down the highway (3 RR 35).

Next, at pp. 27-28 of its Brief (and again at 36-37), Appellant once again cites a mish-mash of irrelevant workplace injury cases in support of its assertion that Appellees were required to prove that ETMC should have supplied training beyond what it actually provided to its EMS Providers. Ours is hardly a case where Appellees' expert blandly concluded, without more, that ETMC had failed to properly train its EMS Providers. Rather, Dr. Wayne's testimony explicitly identified the relevant defect in ETMC's implementation and enforcement of its policies, i.e. that they should have ensured that its EMS Providers knew when to employ physical restraints after initial "talk-down" efforts ceased to be appropriate (3 RR 22, 29, 44). Dr. Wayne likewise identified at what precise junctures in their dealings with Crystal Delaune, the EMS Providers' training should have alerted them to the fact that physical restraints were now required (3 RR 33, 35). The cases cited by Appellant's Brief require nothing more.

**Conclusory Testimony And Inference Stacking**

Next, at pp. 29-30 of its Brief, Appellant complains that the testimony of Appellees' expert Dr. Wayne should be deemed legally insufficient because it is i) "conclusory and *ipse dixit* in nature", and ii) involves "one inference stacked on other inferences".

First, Appellant complains that – in determining that the EMS Providers' training had improperly left such Providers fixated on the talk-down component of restraining psychotic patients, with no effective knowledge of when to escalate to physical restraints – Dr. Wayne improperly relied upon the depositions of such EMS Providers. Appellant's Brief cites to no portion of these depositions which contradict Dr. Wayne's testimony. Instead, at pp. 33-34, Appellant argues that if only different questions had been asked at such depositions (including by Appellant's own counsel), the EMS Providers might have supplied answers favorable to Appellant.

Appellees do not wish to engage in any such speculative game of "what if"; rather, Appellees would simply point out that the above-excerpted <u>trial testimony</u> of EMS Provider Linda Moore emphatically and repeatedly confirms every 'inference' supposedly made by Dr. Wayne from the EMS Providers' earlier <u>deposition testimony</u>. That is, Linda Moore repeatedly testified at trial that her actions, or inactions leading to Crystal Delaune's death were entirely consistent with the training she had received from ETMC, and that such training stressed an unending reversion to talk-down techniques, regardless of the patient's psychotic condition, escalating history of misbehavior, or proximity to harm (2 RR 239; 3 RR 98, 99, 116, 149-50, 189, 200, 202, 204-05, 210).

Next, to the extent that Appellant asserts at p.31 that the *City Of Keller* case entitles it to introduce additional evidence supposedly illustrating how Dr. Wayne gleaned improper inferences from the EMS Providers' depositions, Appellees fully welcome a review of such

additional evidence. *City Of Keller v. Wilson*, 168 SW3d 802, 813 (Tex. 2005). As already noted, the trial testimony of EMS Provider Linda Moore amply confirmed her earlier deposition statements indicating that her training left her unprepared to know when to employ any restraint technique other than mere talk-down.

Likewise, the undisputed facts of the case themselves undeniably support Dr. Wayne's conclusions regarding the inadequacy of the EMS Providers' training, given that the EMS Providers continued to abjure restraining Crystal Delaune, despite her admitted psychotic state, repeated escape attempts (sufficient to cause the EMS Providers to halt the ambulance, and call for but then cancel assistance), and explicit recognition that Ms. Delaune might seek to exit the speeding ambulance (as shown by Moore's ineffective locking of the rear door, in response to Delaune's third attempt). Note that in his testimony, Dr. Wayne stated that he based his conclusion not only on the EMS Providers' depositions, but also on "the events that occurred" (33 RR 141).

At pp. 32-33 of its Brief, Appellant attempts to argue that the EMS Providers' failure to restrain Ms. Delaune merely reflected an independent 'exercise of judgment' that physical restraints were not called for, rather than any deficiencies in training. However, EMS Provider Linda Moore repeatedly testified that all actions taken by her were consistent with the training provided by ETMC (3 RR 98, 99, 116, 149-50, 163, 200, 202, 210). Likewise, Appellees would ask that the Court note the manner in which Appellant's counsel led their employee Linda Moore through her testimony, repeatedly seeking to confirm that that her failure to restrain Crystal Delaune was fully in accordance with ETMC's policy of "verbal first", until required by the Trial Court to halt such leading questions (3 RR 188-89, 193, 195, 197, 199-200). Finally, although Dr. Wayne did indeed testify that the decision to escalate to physical restraints involved the

26

exercise of judgment (3 RR 73), he immediately went on to clarify that an EMS Provider cannot properly *exercise* such judgment unless her training has supplied the underlying knowledge (3 RR 74), which Wayne asserted ETMC's training failed to effectively do.

Next, Appellant's Brief asserts at p. 30 that the essence of Appellees' case is that "the EMS Providers only knew talk-down and were not taught about the use of restraints", and then responds at p. 35 with a flurry of record cites indicating that restraint training did in fact occur. Unfortunately for Appellant, Appellee's expert Dr. Wayne identified a much more specific flaw that was not addressed by ETMC's *generalized* restraint policies, and which led to Crystal Delaune's death: that is, by reason of ETMC's policies, the EMS Providers:

"did not possess … knowledge of the critical next steps when talking down didn't work"(3 RR 22)

"didn't have the intrinsic knowledge, the ability to know to go to the next step."
(3 RR 29)

Thus, the negligence alleged in this case – and upheld by Dr. Wayne's testimony – is **not** whether ETMC's policies generically covered the topic of restraints, nor whether the EMS Providers knew that other restraint levels existed beyond talk-down. Rather, the critical issue is whether such training was effective in educating the EMS Providers as to WHEN it was appropriate to advance beyond verbal to physical restraints. See Dr. Wayne's testimony at 3 RR 41-46, where he indicates no less than seven times that the ultimate issues in our case involved whether ETMC had "properly train[ed] Ms. Moore and Ms. Spurgers on **when** to use restraints on patients like Crystal Delaune" (emphasis added).

By way of a homely example, a police department's policy may well be to train its officers not to immediately draw their firearms upon encountering a suspect, but to wait until physical harm is threatened. All well and good, but if a policeman (and his partner) – in

compliance with such policy, at a real-world crime scene – thereafter indicates that he did not see fit to draw his gun until the suspect's weapon actually injured that policeman, then it would hardly seem a stretch to find that the departmental training policy was deficient. And this would be so despite the fact that i) the officer might have had ample use-of-force training, and ii) such training had clearly informed the officer that he was entitled to use deadly force; the only defect would lie in the all-important question of "when" to do so.

Though Appellant's Brief repeatedly accuses Dr. Wayne of engaging in improper "inference stacking" in reaching his conclusion, such stacking allegation is directly linked to Appellant's misrepresentation that their negligence lies in a wholesale failure to provide any training, or their EMS Providers' total ignorance of physical restraints. As shown above, Dr. Wayne testified that ETMC's training was deficient solely in educating their EMS Providers to know *when* physical restraint was called for, and such opinion was based both on "the events that occurred" (33 RR 141) and on the EMS Providers' depositions, with any such deposition-inferences being repeatedly confirmed by the very same Linda Moore trial testimony that Appellant urges this Court to review. Thus, no "stacking" occurred, and Appellant has failed to back his allegations with any concrete examples.

### *Failure To Understand What Is Taught*

Finally, at pp. 37-43 of its Brief, Appellant takes issue with Dr. Wayne's testimony that the actionable defect in ETMC's training – i.e. regarding "when" to switch over from verbal to physical restraints – lay not in what was put down on paper, but the ignorance demonstrated by both EMS Providers in their depositions.

> A: Okay. Fact one is what your pieces of paper say and what you teach. Fact two is assessing that those people have understood that knowledge. So I don't doubt that East Texas Medical Center's documentation that we all saw is what their documentation is.

28

My concern is that – and my feeling where the failure of standard of care occurred is that if the EMS providers only knew to talk-down, they had not been taught. The paper says that's why you do, but the education wasn't there to validate that piece of paper.
(3 RR 36)

A    My opinion is, again, we have the discrepancy between performance and teaching – or at least paper education. I mean – and I'm not being disrespectful to East Texas Medical Center. I'm sure they're good people – good, caring people. The paperwork says: This is what we teach. The knowledge based by two EMS providers – not one but two – say, "That's not what we knew." So based on those pieces of information, I would say, yes, they fell below the standard of care.
(3 RR 43)

Appellees would begin by noting that there is no evidence or allegation in the Trial Record – from either side – that the EMS Providers <u>departed from their training</u> in failing to know how to restrain Crystal Delaune, and so prevent her death. Rather, Linda Moore repeatedly testified – often with encouragement of Appellant's counsel – that her actions were fully congruent and in compliance with ETMC's policy implementation and enforcement (training) of "verbal first"; i.e., in ETMC's negligent failure to train when to restrain.

Yet, Appellant apparently now seeks to argue that as long as its restraint policy *said* all the right things, it is wholly irrelevant if – after decades of receiving such training – its EMS Providers actually understood when and how to properly apply ETMC's restraint policies in the real world, when caring for troubled human beings. Elsewhere, Appellant's Brief repeatedly refers to the relevant tort in this case as a "failure to train" employees, but seemingly now seeks to claim that such tort should instead be deemed a "failure to draft training manuals". Appellees, in turn, would remind the Court that they have at all times asserted that the relevant tort was ETMC's breach of its duty:

> to formulate, implement, and enforce a policy requiring patients like Ms. Delaune, who are at risk of harming themselves and/or others, to be continuously restrained physically and/or chemically during transport.

29

See 9.02 of Appellees' Second Amended Petition (1 CR 32). Accord, *Mills v. Angel*, 995 SW2d at 269: "courts have recognized a duty to use due care in enforcing such policies and procedures and in ensuring that they are not violated"; *Columbia North Hills Hospital v. Alvarez*, 2011 Tex. App. LEXIS 5908 *12-13 (Tex. App. – Fort Worth 2011, no pet.).

In short, there is no question that ETMC owed a direct duty to Crystal Delaune to not only adopt appropriate policies affecting its care of her, but to likewise see that such policies were <u>implemented and enforced</u>, i.e. actually carried out by its employees while actually caring for patients. See *Durham Transportation, Inc. v. Valero*, 897 SW2d 404, 413 (Tex. App. – Corpus Christi 1995, writ denied), citing *Greater Houston Transportation v. Zrubeck*, 850 SW2d 579, 591-92 (Tex. App. – Corpus Christi 1993, writ denied). Therefore, ETMC's duty to "implement and enforce" its policies necessarily correlates with a requirement that ETMC ensure that its policies effectively *convey* the desired information, as measured by the trained employees' subsequent knowledge of, and conduct in conformance with, the training imparted by ETMC pursuant to its policies. Any assertion by Appellant that its training-related duties did not extend to making sure that the EMS Providers actually understood what ETMC taught them must fail, because the common law duties owed by ETMC to Crystal Delaune likewise encompass a duty "to periodically monitor and review the competency of the members of its medical staff." *Ching v. Methodist Children's Hospital*, 134 SW3d 235, 241 (Tex. App. – Amarillo 2003, pet. denied).

In applying this duty to "implement and enforce" to our present facts, Appellees would cite the ancient legal maxim that "the proof is in the pudding." It is beyond question that, pursuant to its relevant policies, the purpose of training EMS Providers when and how to properly respond to restraint scenarios is to improve their care of actual patients such as Crystal

30

Delaune. Here, not only was Ms. Delaune fatally injured while in the care of ETMC's EMS Providers, but Linda Moore explicitly testified – at the behest of Appellant's counsel – that such disastrous real-world result was fully congruent with Moore's understanding of the "verbal first" training she had received from ETMC. Such testimony is entirely consistent with the fatal flaw in ETMC's implementation and enforcement of its policies, as specifically identified by Dr. Wayne.

Once again, then, the proof is in the pudding, and the tragic results of ETMC's transport of Crystal Delaune speak for themselves. The efficacy of a hospital's implementation and enforcement of its policies must be measured by how well it succeeds in preparing its personnel to respond to known hazards, and not by how comprehensive the syllabus appears on paper. *Valero*, 897 SW2d at 413; *Zrubeck*, 850 SW2d at 591-92; and *Ching*, 134 SW3d at 241. The cases cited by Appellant on pp. 39-43 of its Brief say nothing to the contrary. As with our "gun-shy police officer" hypothetical, all the training policies in the world are of no use if the employer does not *implement and enforce* such by ensuring that the employees possess sufficient knowledge to know **when** to usefully apply such training.

## CONCLUSION

As set out at p. 18 of its Brief, Appellant has chosen to base its appeal solely on grounds that Appellees' evidence was supposedly legally insufficient to support the verdict and judgment against it, as to two issues. As Appellant's own authorities show, the applicable standard of review is a steep one, requiring this Court to first "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not", and secondly to "uphold the jury's finding if more than a scintilla of competent evidence supports it". *Tanner v. Nationwide Mutual*, 289 SW3d 828, 830 (Tex. 2009).

31

Tasked, then, with essentially demonstrating that "no evidence" supports the verdict in Appellees' favor, Appellant stumbles badly. As to its first issue, Appellant centers its argument upon the false claim that – in extending the protections of the Good Samaritan Statute to the EMS Providers only – the Trial Court somehow also ruled that their care of Crystal Delaune categorically *could not have* constituted negligence, by themselves or by their employer ETMC. As demonstrated herein, the Trial Court made no such ruling, and Texas law provides no grounds for excusing employers from their direct liabilities owed to plaintiffs who are actually injured via their employees' actions.

As to Appellant's second issue, Appellant advances an equally bogus claim that the trial testimony of Appellees' expert Dr. Wayne did not adequately establish the requisite elements of Appellees' claim. However, the above-listed excerpts from Dr. Wayne's testimony amply refute all such allegations made by Appellant. Moreover, the above-cited testimony of EMS Provider Linda Moore only serves to confirm – in spades – the validity of the jury's findings regarding the "negligent training" (implementation and enforcement of policies) claims brought against ETMC.

## PRAYER

For the foregoing reasons, Appellees Jody Delaune, Individually and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune, Destiny Delaune and Dee Ann Delaune, Minors request that:

1) the Trial Court's Final Judgment in favor of Appellees be upheld in all respects;

2) that all costs of court and other relief granted Appellees under the Trial Court's Final Judgment be likewise upheld; and

3) Appellees further request all other relief to which they may be entitled, at law or in equity.

32

RESPECTFULLY SUBMITTED:

RYAN KREBS, M.D., J.D.
805 W. 10th Street, Ste. 300
Austin, Texas 78701
(512) 478-2072
(512) 494-0420 -Facsimile
ryan@ryankrebsmdjd.com

RYAN KREBS
State Bar No. 00792088
*Counsel for Appellees*


## CERTIFICATE OF SERVICE

On July 3, 2015, in compliance with Texas Rule of Appellate Procedure 9.5, I hereby certify that a copy of the foregoing Appellees' Brief was served upon all other parties to the trial court's judgment by first-class United States mail, properly posted and deliverable as follows:

THIEBAUD REMINGTON THORNTON BAILEY, LLP
Russell G. Thornton
State Bar No. 19982850
4849 Greenville Avenue, Suite 1150
Dallas, Texas 75206
(214) 954-2200
(214) 754-0999 -Facsimile
rthornton@trtblaw.com

Ryan Krebs

33

**CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 9.4(i)**

I certify that this document contains nine thousand, one hundred twenty-three (9,123) words, as indicated by the word-count function of the computer program used to prepare it, and excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, as provided by Appellate Rule 9.4(i).

_____

Ryan Krebs
*Counsel for Appellees*

# APPENDIX

# APPENDIX "A"

FILED
LOIS ROGERS
DISTRICT CLERK

2014 DEC 23 PM 2: 49

SMITH COUNTY, TEXAS

BY_____
DEPUTY

Cause No. 13-0984-A

| | | |
|---|---|---|
| JODY DELAUNE, Individually; and<br>as Personal Representative of the Estate<br>of CRYSTAL DELAUNE, Deceased;<br>and as Next Friend of DALTON<br>DELAUNE, DESTINY DELAUNE,<br>and DEE ANN DELAUNE, Minors,<br><br>Plaintiffs,<br><br>v.<br><br>EAST TEXAS MEDICAL CENTER<br>D/B/A EAST TEXAS MEDICAL CENTER<br>EMERGENCY MEDICAL SERVICES,<br><br><br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | In the DISTRICT COURT of<br><br><br><br>SMITH COUNTY, TEXAS<br><br><br><br>7th JUDICIAL DISTRICT |

## FINAL JUDGMENT

The Court finds that the jury's verdict in this healthcare liability claim is supported by the evidence and therefore renders judgment against Defendant and for Plaintiffs as follows:

1.     The Court orders that Plaintiff, Jody Delaune, Individually recovers from Defendant, the sum of:

> a.)  $7,500.00 for pecuniary loss sustained in the past;
> b.)  $36,000.00 for pecuniary loss in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Dalton Delaune recovers from Defendant, the sum of:

> c.)  $7,500.00 for pecuniary loss sustained in the past;
> d.)  $20,000.00 for pecuniary loss in the future;
> e.)  $2,500.00 for loss of companionship and society in the past;
> f.)  $2,500.00 for loss of companionship and society in the future;
> g.)  $2,500.00 for mental anguish in the past;

h.) $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Destiny Delaune recovers

from Defendant, the sum of:

> i.) $7,500.00 for pecuniary loss sustained in the past;
> j.) $26,000.00 for pecuniary loss in the future;
> k.) $2,500.00 for loss of companionship and society in the past;
> l.) $2,500.00 for loss of companionship and society in the future;
> m.) $2,500.00 for mental anguish in the past;
> n.) $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Next Friend of Dee Ann Delaune recovers

from Defendant, the sum of:

> o.) $7,500.00 for pecuniary loss sustained in the past;
> p.) $36,000.00 for pecuniary loss in the future;
> q.) $2,500.00 for loss of companionship and society in the past;
> r.) $2,500.00 for loss of companionship and society in the future;
> s.) $2,500.00 for mental anguish in the past;
> t.) $2,500.00 for mental anguish in the future;

The Court orders that Plaintiff, Jody Delaune, as Personal Representative of the Estate of

Crystal Delaune recovers from Defendant, the sum of:

> u.) $3,000.00 for funeral and burial expenses.

The total judgment for a – u above is $181,000.00.

The judgment for "past damages" for items a, c, e, g, i, k, m. o, q and s is $45,000.00.

Plaintiff is entitled to recover prejudgment interest on the $45,000.00 in "past damages." The

prejudgment interest rate on these past damages is equivalent to the post judgment interest

rate of 5%. Tex. Fin. Code § 304.103 (Vernon Supp. 2002). Pursuant to Texas Finance Code

section 304.007, the Court hereby takes judicial notice of the fact that at the time of the

rendition of this judgment, the post judgment interest rate as set by the Consumer Credit

Commission and published in the Texas Register is 5 percent (5%). Pre-judgment interest in

a health care liability claim begins accruing on the earlier of the 180th day after the date

Defendant received written notice of the claim or the date suit is filed and ends on the date

before the judgment is signed. Defendant received written notice of the claim on November

8, 2012. See Exhibit B attached to Plaintiffs' First Amended Motion for Judgment on the Verdict. (Plaintiffs' Original Petition was filed April 15, 2013). 180 days from November 8, 2012 is May 7, 2013. May 7, 2013 to December 21, 2014, the day before signing of the judgment on December 22, 2014 is 594 days or 1.63 years (594/365 = 1.63). Using these calculations, the Court finds that prejudgment interest of 5% simple interest on the $45,000.00 in "past damages" accruing 1.63 years is $3,661.64 (.05 x 1.63 x 45,000 = 3,661.64).

2.   The Court orders that Plaintiffs, Jody Delaune, Individually; and as Personal Representative of the Estate of Crystal Delaune, Deceased; and as Next Friend of Dalton Delaune, Destiny Delaune, and Dee Ann Delaune, Minors, recover from Defendant taxable court costs in the amount of $7,377.48 from Defendant. See Exhibit C attached to Plaintiffs' First Amended Motion for Judgment on the Verdict.

3.   The Court orders that the total judgment for damages recoverable by Plaintiffs from Defendant as reflected in the Charge of the Court attached to Plaintiffs' First Amended Motion for Judgment on the Verdict as Exhibit A, taxable court costs attached to Plaintiffs' First Amended Motion for Judgment on the Verdict as Exhibit C, and pre-judgment interest on past damages is $192,039.12 (181,000 + 7,377.48 + 3,661.64 = 192,039.12).

4.   Pursuant to Texas Finance Code section 304.005(a) (Vernon Supp. 2002), the Court orders that post judgment interest will begin to accrue on this judgment at the legal rate of 5% beginning on the date this judgment is signed and that Defendant is responsible and shall continue to be responsible to Plaintiffs for such post judgment interest until the judgment is satisfied in full.

5.   The Court orders execution to issue for this judgment.

6.   This judgment finally disposes of all claims and all parties and is appealable.

7.    The Court denies all relief not granted in this judgment.

SIGNED on this 23rd day of December , 2014.

Judge Kerry L. Russell

# APPENDIX "B"

FILED
LOIS ROGERS
DISTRICT CLERK

2014 NOV 24 PM 1: 49

BY _____ DEPUTY

CAUSE NO. 13-0984-A

JODY DELAUNE, Individually; and      §      IN THE 7TH DISTRICT
as Personal Representative of the Estate      §      SMITH COUNTY, TEXAS
of CRYSTAL DELAUNE, Deceased;      §
and as Next Friend of DALTON      §
DELAUNE, DESTINY DELAUNE,      §
and DEE ANN DELAUNE, Minors,      §
     §
Plaintiffs,      §
     §
v.      §      COURT IN AND FOR
     §
EAST TEXAS MEDICAL CENTER      §
d/b/a EAST TEXAS MEDICAL      §
EMERGENCY MEDICAL SERVICES,      §
     §
Defendant.      §      SMITH COUNTY, TEXAS

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Here are the instructions for answering the questions.

1.      Do not let bias, prejudice, or sympathy play any part in your decision.

2.      Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.      You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.    If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.    All the questions and answers are important. No one should say that any question or answer is not important

6.    Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7.    Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.    Do not answer questions by drawing straws or by any method of chance.

9.    Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.    Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.    The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

"Negligence" when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means failure to use ordinary care, that is, failing to do that which an emergency medical services provider of ordinary prudence would have done under the same or

similar circumstances or doing that which an emergency medical services provider of ordinary prudence would not have done under the same or similar circumstances. A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

"Ordinary care," when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means that degree of care that an emergency medical services provider of ordinary prudence would use under the same or similar circumstances. An emergency medical services provider acts in the manner in which it formulates, implements, and enforces its policies, procedures, rules, bylaws, and other governing protocols, whether express or implied.

"Proximate cause," when used with respect to the conduct of East Texas Medical Center Emergency Medical Services, means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an emergency medical services provider using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

QUESTION 1

Did the negligence, if any, of East Texas Medical Center Emergency Medical Services proximately cause the death of Crystal Delaune?

Answer "Yes" or "No":

Answer: ___Yes___

Answer Question 2 if you answered "Yes" for Question 1. Otherwise, do not answer Question 2.

QUESTION 2

What sum of money, if paid now in cash, would fairly and reasonably compensate Jody Delaune for his damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1.      Pecuniary loss sustained in the past:

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Jody Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 7,500.00

2.      Pecuniary loss that, in reasonable probability, will be sustained in the future.

Answer: 36,000.00

3.      Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Jody Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 0.00

4.      Loss of companionship and society that, in reasonable probability, will be sustained in the future.

Answer: $ 0.00

5.      Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Jody Delaune because of the death of Crystal Delaune.

Answer: $            0.00

6.      Mental anguish that, in reasonability probability, will be sustained in the future.

Answer: $            0.00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Jody Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 3 if you answered "Yes" for Question 1. Otherwise, do not answer Question 3.

QUESTION 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Dalton Delaune for his damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1.      Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Dalton Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ __7,500.00__

2.      Pecuniary loss that, in reasonable probability, Dalton Delaune will sustain in the future.

Answer: $ __20,000.00__

3.      Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Dalton Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ __7,500.00__

4.      Loss of companionship and society that, in reasonable probability, Dalton Delaune will sustain in the future.

Answer: $ __2,500.00__

5.      Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Dalton Delaune because of the death of Crystal Delaune.

Answer: $ **2,500.00**

6.      Mental anguish that, in reasonability probability, Dalton Delaune will sustain in the future.

Answer: $ **2,500.00**

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Dalton Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 4 if you answered "Yes" for Question 1. Otherwise, do not answer Question 4.

QUESTION 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Destiny Delaune for her damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1.      Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Destiny Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $    7,500.00

2.      Pecuniary loss that, in reasonable probability, Destiny Delaune will sustain in the future.

Answer: $    26,000.00

3.      Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Destiny Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $    2,500.00

4.      Loss of companionship and society that, in reasonable probability, Destiny Delaune will sustain in the future.

Answer: $    2,500.00

5.      Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Destiny Delaune because of the death of Crystal Delaune.

Answer: $ _2,500_ . 00

6.      Mental anguish that, in reasonability probability, Destiny Delaune will sustain in the future.

Answer: $ _2,500_ . 00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Destiny Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 5 if you answered "Yes" for Question 1. Otherwise, do not answer Question 5.

QUESTION 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Dee Ann Delaune for her damages, if any, resulting from the death of Crystal Delaune?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

1. Pecuniary loss sustained in the past.

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that Dee Ann Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 7,500.00

2. Pecuniary loss that, in reasonable probability, Dee Ann Delaune will sustain in the future.

Answer: $ 36,000.00

3. Loss of companionship and society sustained in the past.

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that Dee Ann Delaune, in reasonable probability, would have received from Crystal Delaune had she lived.

Answer: $ 2,500.00

4. Loss of companionship and society that, in reasonable probability, Dee Ann Delaune will sustain in the future.

Answer: $ 2,500.00

5. Mental anguish sustained in the past.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Dee Ann Delaune because of the death of Crystal Delaune.

Answer: $ 2,500.00

6. Mental anguish that, in reasonability probability, Dee Ann Delaune will sustain in the future.

Answer: $ 2,500.00

In determining damages elements for 3, 4, 5, and 6, you may consider the relationship between Dee Ann Delaune and Crystal Delaune, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

Answer Question 6 if you answered "Yes" for Question 1. Otherwise, do not answer Question 6.

QUESTION 6

What sum of money would have fairly and reasonably compensated Crystal Delaune for—

1.      Pain and mental anguish.

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Crystal Delaune before her death as a result of the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: $_____ 0 . 00

2.      Funeral and burial expenses.

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Crystal Delaune reasonably suitable to her station in life.

Answer in dollars and cents for damages, if any.

Answer: $ 3,000 . 00

PRESIDING JUROR

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

a. have the complete charge read aloud if it will be helpful to your deliberations;

b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

c. give written questions or comments to the bailiff who will give them to the judge;

d. write down the answers you agree on;

e. get the signatures for the verdict certificate; and

f. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE

1. You may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another.

2. If ten jurors agree on every answer, those ten jurors sign the verdict.

If eleven jurors agree on every answer, those eleven jurors sign the verdict.

If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those then who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

SIGNED this 24th day of November, 2014.

_____
HONORABLE KERRY L. RUSSELL
JUDGE PRESIDING, 7TH DISTRICT COURT

# VERDICT CERTIFICATE

*Check one:*

      Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____     _____
Signature of Presiding Juror             Printed Name of Presiding Juror

      Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

      Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

          Signature                              Name Printed

FILED
LOIS ROGERS
DISTRICT CLERK
2014 NOV 24 PM 8: 56
SMITH COUNTY, TEXAS
BY ____ DEPUTY

| | Signature | Name Printed |
|---|---|---|
| 1. | *Marsha Warren* | MARSHA WARREN |
| 2. | *Ruth Freeney* | Ruth Freeney |
| 3. | *Andrea B. Wilson* | Andrea B. Wilson |
| 4. | *Stacy Martin* | STacy y MARTiN |
| 5. | *Margie Boone* | Margie Boone |
| 6. | *Benjamin C. Terry* | Benjamin C. Terry |
| 7. | *Kirk Oldham* | Kirk OLDHAM |
| 8. | *Chris Harman* | Chris Harman |
| 9. | *Luke Porter* | Luke Porter |
| 10. | *Luke Stanly* | Luke Stanly |
| 11. | *WL Smotherman* | WL Smotherman |

# APPENDIX "C"

FILED
LOIS ROGERS
DISTRICT CLERK

2014 JUL 29 PM 2: 59

BY_____
DEPUTY

**Cause No. 13-0984-A**

| | | |
|---|---|---|
| JODY DELAUNE, Individually; and | § | In the DISTRICT COURT of TEXAS |
| as Personal Representative of the Estate | § | |
| of CRYSTAL DELAUNE, Deceased; | § | |
| and as Next Friend of DALTON | § | |
| DELAUNE, DESTINY DELAUNE, | § | |
| and DEE ANN DELAUNE, Minors, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| EAST TEXAS MEDICAL CENTER | § | |
| EMS, LINDA MOORE, and | § | |
| LINDY SPURGERS, | § | |
| | § | |
| Defendants. | § | 7th JUDICIAL DISTRICT |

**Order on ~~Defendants' Reply~~**
**~~to Plaintiffs' Response to~~ Defendants' Traditional and No-Evidence Motions for**
**Summary Judgment Regarding Wilful or Wanton Negligence**

Defendants East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services, Linda Moore, and Lindy Spurgers (together, "Defendants") presented their Reply to Plaintiffs' Response to Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful or Wanton Negligence in addition to their Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful and Wanton Negligence. The Court, having reviewed the motions, Plaintiffs' response to the motions, the applicable law, and the argument of counsel, if any, is of the opinion Defendants' motions should be **granted.**

It is, therefore, ORDERED, ADJUDGED, and DECREED that ~~Defendants' Reply to~~ ~~Plaintiffs' Response to~~ Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful or Wanton Negligence and Defendants' Traditional and No-Evidence Motions for Summary Judgment Regarding Wilful and Wanton Negligence are **GRANTED,** and all claims brought by Plaintiffs against Linda Moore and Lindy Spurgers are dismissed with prejudice.

All relief not expressly granted herein is denied.

SIGNED this **28ᵗʰ** day of July _____, 2014.

_____
Judge Presiding